The **ESTATE OF** Konerak **SINTHASOMPHONE**, by its special administrator, **Anoukone SINTHASOMPHONE**, Sounthone Sinthasomphone, Somdy Sinthasomphone, Thavone Vong Phasouk, Anoukone Sinthasomphone, Nousone Sinthasomphone, Saysamone Sinthasomphone, Keisone Phalphouvong, Chanthalone Sinthasomphone, and Somsack Sinthasomphone, by his guardian ad litem, Dennis P. Coffey, Plaintiffs,

v.

The **CITY OF MILWAUKEE**, a municipal corporation, Joseph Gabrish, John A. Balcerzak, and Richard Porubcan, Defendants.

---

Cheryl BRADEHOFT and Sarah Mae Bradehoft, a minor, by Cheryl Bradehoft, her mother and natural guardian, Plaintiffs,

v.

CITY OF MILWAUKEE, a municipal corporation, John A. Balcerzak, Joseph T. Gabrish, and Richard Porubcan, Defendants.

Tracy EDWARDS, Plaintiff,

v.

CITY OF MILWAUKEE, a municipal corporation, and Three Unknown Milwaukee Police Officers, Defendants.

Catherine LACY, Plaintiff,

v.

CITY OF MILWAUKEE, a municipal corporation, Joseph Gabrish, John A. Balcerzak, Richard Porubcan, ABC Insurance Company, and XYZ Insurance Company, Defendants.

Civ. A. Nos. 91–C–1121, 91–C–942, 91–C–985 and 91–C–1337.

United States District Court, E.D. Wisconsin.

March 5, 1992.

Robert A. Slattery, Paul R. Hoefle, Slattery & Hausman, Ltd., and Curry First, Lawrence G. Albrecht, Patrick O. Patterson, Hall, First & Patterson, S.C., Milwaukee, Wis., for plaintiffs in No. 91–C–1121.

David M. Kaiser and David I. Rothstein, Milwaukee, Wis., for plaintiffs in No. 91–C–942.

Syed A. Salat, Baton Rouge, La., for plaintiff in No. 91–C–985.

David M. Wittenberg, Wittenberg & Dougherty, Ltd., Chicago, Ill., and Curtis M. Kirkhuff, Pellino, Rosen, Mowris & Kirkhuff, Madison, Wis., for plaintiff in No. 91–C–1337.

Rudolph M. Konrad, Deputy City Atty., Milwaukee, Wis., for defendant City of Milwaukee.

D. Michael Guerin, Gimbel, Reilly, Guerin & Brown, Milwaukee, Wis., for defendant Porubcan.

Robert F. Johnson, Philip C. Reid, Cook & Franke, S.C., Milwaukee, Wis., for defendants Gabrish and Balcerzak.

## DECISION AND ORDER

TERENCE T. EVANS, Chief Judge.
"I'm on 25th and State, and there is this young man. He's buck naked. He has been beaten up ... He is really hurt ... He needs some help."

With these words, a caller asked a Milwaukee Emergency 911 operator to send help to a person in need of assistance. When the call was made, on May 27, 1991, the name Jeffrey Dahmer was largely unknown. Today, everyone knows the story of the 31–year–old chocolate factory worker, a killing machine who committed the most appalling string of homicides in this city's history.

Dahmer's misdeeds have been widely chronicled. Dahmer, who is white, has confessed to killing 17 young men between the ages of 14 and 28. Eleven of the victims were black, and most were lured into Dahmer's web with promises of, among other things, a sexual experience. The case is incredibly gruesome and bizarre; the dismembered bodies of many of the victims— hearts in the freezer, heads in the fridge— were preserved in Dahmer's small near west-side apartment. The leftovers were deposited in a barrel of acid, conveniently stationed in the kitchen.

Dahmer pled guilty to 15 of his 16 Milwaukee County homicides[1]. The 15 murders were committed between January of 1988 and July of 1991. Last month, a jury rejected Dahmer's insanity plea. Today he is a guest of the state of Wisconsin, having been sentenced to life imprisonment without the possibility of parole.

Dahmer's recent well-publicized state court trial dealt with a narrow issue; his mental state at the time of the murders. These four federal civil cases raise broader issues, issues that concern the community at large. The issues here concern the conduct of several police officers, policies and attitudes of the police department toward minorities and gays, and the rights of some of the victims of Dahmer's madness. This decision will address some of the issues presented in the cases.

The telephone call for help on May 27 was made from a phone booth just a half a block away from Dahmer's apartment. The subject of the call was Konerak Sinthasomphone, a 14–year–old Laotian boy. Later that evening, after the police had responded to the call and determined that nothing was amiss, Dahmer killed Sinthasomphone. He went on to kill others, in-

---

**1.** He was not charged with killing Steven Tuomi in Milwaukee in 1987. He is charged with killing Steven Hicks in Bath Township, Ohio, in 1978.

cluding Matt Turner in June, Jeremiah Weinberger in early July, and Oliver Lacy and Joseph Bradehoft in mid-July. He terrorized Tracy Edwards before Edwards escaped and led the police to Dahmer, who was finally arrested on July 22, 1991. After the arrest, Dahmer confessed to 17 murders.

The estate of Konerak Sinthasomphone and his family have filed a lawsuit claiming that the police officers and the City of Milwaukee violated their constitutional rights. Catherine Lacy, Oliver Lacy's mother; Cheryl Bradehoft, Joseph Bradehoft's wife; Sarah Mae Bradehoft, his daughter; and Tracy Edwards are plaintiffs in the other lawsuits. The defendants include Joseph Gabrish, John Balcerzak, and Richard Porubcan, the three Milwaukee police officers who responded to the May 27 call, and the City of Milwaukee itself. The defendants have moved to dismiss the cases, under rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the complaints fail to state claims upon which relief can be granted.

## THE CLAIMS

The details of Dahmer's killings are widely known and undisputed. As to the details of what occurred on May 27, however, the facts and the inferences to be drawn from the facts are in dispute. In deciding on a rule 12 defense motion to dismiss a complaint, I must focus solely on the allegations as pleaded. All factual allegations must be accepted as true in analyzing a motion to dismiss a complaint. A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1955).

As alleged in the amended *Sinthasomphone* complaint, the facts, which at this time I must legally assume to be true, are as follows.

In May of 1991, the 31–year–old Dahmer was on probation following a 1988 convic-

tion for sexual abuse of a male child. He brought young Sinthasomphone to his apartment. There he held the boy captive, drugged him, stripped him of his clothing, and committed acts of physical and sexual abuse. All the while, the remains of previous victims of Dahmer's madness lay decaying in another room of the apartment.

Somehow, shortly before 2 a.m. on May 27, 1991, Sinthasomphone escaped from the apartment and—although he was drugged, naked, and bleeding—made his way to the street. On the street, Nichole Childress and Sandra Smith, two young black women, saw him and called the police. Before the police arrived, Dahmer appeared and tried to reassert physical control over Sinthasomphone. Childress and Smith intervened.

Officers Balcerzak, Gabrish, Porubcan, and an unidentified MPD trainee came to the scene, as did Milwaukee Fire Department personnel, including paramedics. The police officers directed the fire department personnel to leave.

The complaint alleges, and again I must on this motion accept the allegations as true, that the officers intentionally and deliberately refused to listen to the following specific information conveyed by Nichole Childress, Sandra Smith, and others: that Sinthasomphone was a child; that he was trying to escape from Dahmer, that Dahmer had referred to Sinthasomphone by various names; that Dahmer was attempting to physically control Sinthasomphone; and that Sinthasomphone was drugged, hurt, and had been sexually abused. The officers threatened to arrest Childress and Smith if they persisted in trying to help Sinthasomphone or to provide information.

Another allegation is that the police officers took Dahmer and Sinthasomphone into actual, physical police custody and back into Dahmer's apartment, where they ultimately delivered Sinthasomphone into Dahmer's custody, without obtaining consent from Sinthasomphone or his parents. The police concluded that Dahmer and Sinthasomphone were adult homosexual partners

who, at least at that time, were staying together in Dahmer's apartment. By returning young Sinthasomphone to Dahmer, it is claimed that the police interfered with any potential rescue of Sinthasomphone by private persons.

The complaint also sets out allegations that the City of Milwaukee, through its police department, has a longstanding practice of intentional discrimination against and reckless disregard of the rights of racial minorities and homosexuals. The unlawful conduct of the officers in this case reflects, the complaint states, "practices and customs so permanent and well-settled as to constitute *de facto* City and MPD policy." The policy is established in part, it is claimed, by the use of excessive force against racial minorities; failure to adequately train police cadets; failure to discipline police officers for using excessive force against racial minorities; failure to respond to complaints by racial minorities; failure to hire and promote racial minorities unless ordered to do so by a court; and failure to train officers in interracial communication skills. In addition, the complaint points to substantial civil rights litigation, with incidents dating back to 1958, to reveal what it says is the discriminatory history of the Milwaukee Police Department. The department's history of discrimination is revealed, it is alleged, by the strong criticism of current chief Philip Arreola's "isolated condemnation" of the police conduct in this case, criticism heard from the police union, numerous officers, and two prior Milwaukee police chiefs.

The complaint further alleges that Officers Balcerzak, Gabrish, and Porubcan are products of the discriminatory policies, "which led them to the wrong conclusion that they stand in opposition to minority members of the community which they serve.... This caused them not to perceive that crimes had been committed before their arrival, and were continuing before their eyes on May 27, 1991." It caused them to treat "an obviously serious and grave incident with deliberate indifference, and jocularity, as if it were somehow comical." It caused them to disregard a call from a concerned black citizen, shortly after Sinthasomphone was returned to Dahmer, in which the caller insisted that Sinthasomphone was a child. It caused the police to disregard information that a reported missing person, Konerak Sinthasomphone, was the victim in the May 27 incident. All of these actions, it is alleged, deprived Sinthasomphone of his constitutionally protected rights to substantive due process and the equal protection of the laws and his family of their rights to familial association with him.

In the *Lacy, Bradehoft,* and *Edwards* cases, the allegations are that the plaintiffs' rights have been denied because of the actions of the police in the *Sinthasomphone* case. The essence of the claims is that the police ignored the complaints of citizens belonging to a racial minority and allowed Dahmer to escape from their grasp. Had Dahmer been stopped on May 27, Lacy, Bradehoft, and Edwards would not have been victimized.

### SINTHASOMPHONE: Substantive Due Process and Equal Protection

The legal difficulties posed by these cases are immediately apparent to anyone with even a passing familiarity with federal civil rights litigation. The genius of the *Sinthasomphone* complaint in trying to avoid those difficulties is also apparent. The question is whether it has succeeded.

A major difficulty is that posed by a doctrine reaffirmed in a recent case, *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Essentially, it is that the purpose of the Constitution "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 S.Ct. at 1003. Joshua DeShaney, who was 5 years old, was beaten and rendered profoundly retarded by his father, with whom he lived. Social workers and other local officials had received complaints that the father was abusing the boy, but they did not remove him from his father's custody. After he was beaten for the last time, Joshua and his mother brought a case in this court, pursuant to 42 U.S.C. § 1983, alleging that

Joshua's substantive due process right to liberty was abridged when the officials failed to intervene to protect him from his father. Judge John Reynolds, to whom the case was assigned, found that no constitutionally recognized claim was present. The court of appeals and the Supreme Court agreed, with the higher court noting that the state's failure to protect an individual against private violence does not constitute a violation of the due process clause.

In addition, the Court rejected the contention that the state officials had entered into a "special relationship" with Joshua because the officials knew he faced a special danger from his father, proclaimed their intention to protect him, and thus had a duty to do so in a reasonably competent fashion. A special relationship exists, the Court said, when "the State takes a person into its custody and holds him there against his will ...", most often in a prison or mental hospital, not when he is left with his father.

Other cases have reached a similar result. In *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988), the court of appeals for this circuit upheld my dismissal of claims that a Racine Fire Department dispatcher had failed to send a rescue vehicle to a woman who later died. In *Ellsworth v. City of Racine*, 774 F.2d 182 (7th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986), the court of appeals upheld Judge Myron Gordon's dismissal of a claim that the Racine Police Department, after agreeing to provide protection to the wife of an undercover narcotics officer, failed to protect her from a beating by a masked assailant. *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir.1991), involved a woman who, accompanied by a deputy sheriff, visited her estranged husband and was killed by him. The court of appeals upheld the dismissal, by Western District Judge John Shabaz, of the case on summary judgment. The court relied on two factors: that the State did not create the danger and that it did not subject her *involuntarily* to an existing danger.

However, the *DeShaney* doctrine is not without some small cracks in its surface;

hairline, perhaps, but cracks nonetheless. In *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), the court determined that Chicago police violated the constitution when they left three children, unattended, in a car on the Chicago Skyway after arresting the adult who had been driving the car in which the children were riding. After exposure to the cold, the children left the car, crossed eight lanes of traffic, and wandered around on the freeway at night searching for a telephone. Presumably, on those egregious facts, a violation would be found today, even after *DeShaney*.

*Ross v. United States*, 910 F.2d 1422 (7th Cir.1990), is, in fact, a case which was decided after *DeShaney*. A 12–year–old boy slipped into the water of Lake Michigan. A friend summoned help, and within 10 minutes two lifeguards, two fire fighters, one police officer, and two civilians, who were scuba-diving nearby, responded. However, before any rescue attempt could begin, a Lake County deputy sheriff arrived in a marine patrol boat. He insisted on enforcing an agreement between the city of Waukegan, Illinois, and Lake County, Illinois, which required the county to provide all police services on Lake Michigan. Pursuant to that agreement, the sheriff had promulgated a policy that directed all members of the sheriff's department to prevent any civilian from attempting to rescue a drowning person and contemplated that only divers from the city of Waukegan Fire Department could perform rescues. The deputy ordered all rescue attempts to stop. When the civilian scuba divers offered to attempt a rescue at their own risk, the deputy threatened to arrest them. Twenty minutes later, 30 minutes after the first would-be rescuers had arrived, the officially authorized divers pulled the boy from the water. He later died. The court found that the complaint stated a claim against both Lake County and the individual deputy.

The line between *DeShaney* and *Ross* may not be entirely clear, but it is discernable. Both courts, in fact, have articulated where it is. Justice Brennan, dissenting in *DeShaney*, points out that the result in a given case may depend on the character-

ization of the violation: is it a failure to act or an affirmative act:

> In a constitutional setting that distinguishes sharply between action and inaction, one's characterization of the misconduct alleged under § 1983 may effectively decide the case. Thus, by leading off with a discussion (and rejection) of the idea that the Constitution imposes on the States an affirmative duty to take basic care of their citizens, the Court foreshadows—perhaps even preordains—its conclusion that no duty existed even on the specific facts before us.

489 U.S. at 204, 109 S.Ct. at 1008.

Threading its way through the action-inaction distinction, the court in *Ross* states that the actions of the deputy and the policy of the county did not constitute a simple failure to provide rescue services, as had occurred in *Archie*. Rather,

> [t]he plaintiff complains of a much different type of constitutional wrong. The plaintiff does not allege that the county had a policy of refusing to supply rescue services. Rather, the wrong suffered by the plaintiff and her decedent is the county's forced imposition of services that William [the boy who drowned] did not want or need; the plaintiff alleges that the county had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative.

910 F.2d at 1431.

The distinction is not new. In 1982, in *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982), the court said:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tort-feasor as if it had thrown him into a snake pit.

■ Obviously, having dissected these cases, the *Sinthasomphone* plaintiffs have not merely alleged that the police officers failed to protect Konerak Sinthasomphone from Jeffrey Dahmer. Rather, they allege, among other things, that the officers actively prevented private citizens from helping Sinthasomphone and, in fact, delivered Sinthasomphone, who was a minor, not to his parents, but into Dahmer's custody. The police left him with Dahmer despite the persistent attempts of private citizens to urge them to investigate further. One of the officers assured a concerned private citizen, who later called the police station, that everything was under control. In other words, the allegations are not just of police inaction, but of police action, action which violated Konerak Sinthasomphone's substantive due process rights. I find that a claim is stated on this basis alone.

Nevertheless, other allegations deserve mention—allegations which also may serve to distinguish this case from *DeShaney*. As I stated above, in *DeShaney* the Court rejected the argument that Joshua DeShaney was in a "special relationship" with the state officials. Under the law, were a special relationship to be found, the officials could have been responsible for what happened to Joshua. The Court pointed out that Joshua had been temporarily in the custody of the state, but he was then returned to the custody of his father, where he lived for 15 months before he was injured. The Court found that no special relationship could be inferred from the state's knowledge of his predicament or its "expressions of intent to help him."

The *Sinthasomphone* case is different, but is it different enough? Sinthasomphone had escaped from Dahmer and had found persons to help him. He also, it is claimed, showed fear of Dahmer. However, he was then taken into what could be termed, at least, as brief police custody. During the time the police were in control, they prevented others from helping him. Then the police returned him to Dahmer's apartment. They were returning a minor, the complaint alleges, not to the custody of his parents, but to an unrelated adult with no legitimate claim to custody. That person then killed him almost as soon as the police left. It is a difficult question whether this creates a "special relationship."

Outside of prisons [*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)] or mental institutions [*Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)] courts have been reluctant to find special relationships. For example, in *Harris v. District of Columbia*, 932 F.2d 10 (D.C.Cir.1991), the court considered whether police officers had a qualified immunity from suit. The officers took Derrick D. Harris into custody. He was suffering severe effects from an overdose of PCP. There was a delay in getting him admitted to a hospital and he died. The court determined that the police officers were not under "a clearly established constitutional obligation to obtain medical care for Harris" based on a special relationship with him and that they therefore were entitled to a qualified immunity. The majority opinion indicated, however, that they were deciding the qualified immunity issue: whether an obligation was "clearly established," not whether a constitutional obligation existed. A fine point, and one which will no doubt arise again in this case.

■ In the *Sinthasomphone* case, at the motion to dismiss stage, I cannot say that no special relationship existed between Konerak and the three police officers.

■ Finally, the cases uniformly emphasize that if police action—or even police inaction is a product of intentional discrimination, it violates the equal protection clause. The *Sinthasomphone* complaint clearly states a claim that the actions of the officers and the policy of the City both are due to intentional discrimination on the "basis of race, color, national origin, or sexual orientation." ¶ 39.

SINTHASOMPHONE: Municipal Liability

■ Another major hurdle which must be overcome if the claim against the City of Milwaukee is to escape dismissal is that posed first in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to state a claim under section 1983, plaintiffs must allege that they held constitutionally protected rights; that they were deprived of those rights; that the defen-

dants either intentionally caused the deprivation or were deliberately indifferent to it, and that the defendants acted under color of state law. If a claim is to be stated against a municipality, there must also be an allegation that the constitutional deprivation was caused by a municipal policy, practice, or custom.

The *Sinthasomphone* complaint goes to great lengths to plead that a *de facto* custom or policy exists which led the police officers to act as they did in this incident. The City has requested that these allegations be stricken as "immaterial and impertinent." That request is DENIED.

As outlined above, the complaint contends that dating back to 1958, the Milwaukee Police Department has been involved in discrimination against racial minorities. The custom alleged is revealed, the complaint states, by the reaction of police union officials to the disciplinary action taken by a relatively new police chief against the officers involved in this incident. It is also revealed, the complaint says, by the public reaction of prior police chiefs against that disciplinary action. Given this context, the officers were led to their perceptions both as to what the situation was on May 27 and the acceptability of their attitudes immediately following the incident.

The City contends that the alleged policies of the MPD do not bear any specific relationship to the allegations in the complaint and that the statement that the current chief disciplined the officers precludes the claim and shows that there is no custom or policy as alleged.

The complaint sets forth a very broad indictment of the Milwaukee Police Department. It asserts that over the years a mind-set has been established in the department: certain discriminatory behavior has been tolerated, giving officers the impression that they can get by with behavior which leads to incidents such as that of May 27. The impression is revealed again by what is said to be intemperate remarks of former police chiefs and by officials of the police union opposing the disciplinary action subsequently taken against the offi-

cers. I find that the complaint states a claim that a *de facto* custom or policy exists, giving rise to section 1983 liability. Proving the claim may be a difficult task, but the difficulty of proof is not relevant at this stage of the proceedings. A jury will have to eventually resolve this issue.

### SINTHASOMPHONE: Claims of Parents and Siblings

The defendants contend that the claims of the siblings and the parents of Konerak Sinthasomphone must be dismissed. The parties have thoroughly briefed this issue, analyzing recent cases from various circuits. Although several cases are discussed, the controlling precedent is *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984). Relying on *Bell,* the claims of the siblings are dismissed. Those of the parents will be allowed to proceed.

### COMPLAINTS OF LACY, BRADEHOFT, AND EDWARDS

■ Intuitively, looking at all four cases, one can see that the *Sinthasomphone* case is the strongest. The police had contact with and arguably an opportunity to save Konerak Sinthasomphone and they did not do so. Rather, it can be argued, they placed him in danger. The other cases are derivative: if Sinthasomphone had been rescued, Dahmer would not have been able to harm the others. One can also see by the discussion above that there are significant legal issues posed by the *Sinthasomphone* complaint. So much more, then, are the problems posed by the other cases.

The dispositive issue in the *Lacy, Bradehoft,* and *Edwards* cases is that decided in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In that case a California parole board paroled a violent sex offender. Five months later he killed a 15–year–old girl. The Court pointed out that the parole board did not harm the girl; the parolee did. Furthermore, the Court stated:

> [T]he parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger.... we do hold that at least under the particular circumstances of this parole decision, appellants' dece-

dent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.

*Id.* at 285, 100 S.Ct. at 559.

It cannot be said, by any stretch of the imagination, that the City of Milwaukee or its police officers had a "special relationship" with Lacy, Bradehoft, or Edwards prior to Edwards' escape from Dahmer. In addition, the police had no way of knowing that these men, in the language of *Martinez,* "faced any special danger" from Dahmer. Those killed, or in Edwards' case terrorized, by Dahmer after he murdered Sinthasomphone present a consequence of the police action that is "too remote" under the law to establish liability on any of the defendants. The complaints growing out of the deaths of Oliver Lacy and Joseph Bradehoft must, under the law, be dismissed. The Edwards complaint has not been served. On my own motion, it is also dismissed. The only person they can look to for compensation under the law is Dahmer himself—the perpetrator of the vile crimes committed against them. The law does not make the City or the three police officers answerable to them.

IT IS THEREFORE ORDERED that the motions of the defendants for dismissal of the *Sinthasomphone* complaint are DENIED, with the exception of the claims of the siblings of Konerak Sinthasomphone.

IT IS FURTHER ORDERED that the complaints in 91–C–942, 91–C–1337, and 91–C–985, the cases of Lacy, Bradehoft, and Edwards, are DISMISSED.

IT IS FURTHER ORDERED that a scheduling conference will be held in court on the *Sinthasomphone* case on April 6, 1992, at 9 a.m.