The ESTATE OF Konerak SINTHASOMPHONE, by its special administrator, Anoukone SINTHASOMPHONE; Sounthone Sinthasomphone; and Somdy Sinthasomphone, Plaintiffs,

v.

The CITY OF MILWAUKEE, a municipal corporation; Joseph Gabrish; John A. Balcerzak; and Richard Porubcan, Defendants.

Civ. A. No. 91–C–1121.

United States District Court, E.D. Wisconsin.

Nov. 23, 1993.

Robert Slattery, Slattery & Hausman, Ltd., and Curry First, Hall, First & Patterson, S.C., Milwaukee, WI, for plaintiffs.

Robert Johnson, Cook & Franke, S.C., D. Michael Guerin, Gimbel, Reilly, Guerin & Brown, Rudolph M. Konrad, Deputy City Atty., Milwaukee, WI, for defendants.

### ORDER

TERENCE T. EVANS, Chief Judge.

I open this decision by repeating what I said in a decision issued in this case (and three other consolidated cases) a year and a half ago, on March 5, 1992, 785 F.Supp. 1343. In that decision, I wrote:

"I'm on 25th and State, and there is this young man. He's buck naked. He has been beaten up ... He is really hurt ... He needs some help."·

With these words, a caller asked a Milwaukee emergency 911 operator to send help to a person in need of assistance. When the call was made, on May 27, 1990, the name Jeffrey Dahmer was largely unknown. Today, everyone knows the story of the 31–year–old chocolate-factory worker, a killing machine who committed the most appalling string of homicides in this city's history.

Dahmer's misdeeds have been widely chronicled. Dahmer, who is white, has confessed to killing 17 young men between the ages of 14 and 28. Eleven of the victims were black, and most were lured into Dahmer's web with promises of, among other things, a sexual experience. The case is incredibly gruesome and bizarre; the dismembered bodies of many of the victims—hearts in the freezer, heads in the fridge—were preserved in Dahmer's small near-westside apartment. The leftovers were deposited in a barrel of acid, conveniently stationed in the kitchen.

Dahmer pled guilty to 15 of his 16 Milwaukee County homicides.[1] The 15 murders were committed between January of 1988 and July of 1991. Last month, a jury rejected Dahmer's insanity plea. Today he is a guest of the state of Wisconsin, having been sentenced to life imprisonment without the possibility of parole.

Dahmer's recent well-publicized state court trial dealt with a narrow issue; his mental state at the time of the murders. These four federal civil cases raise broader issues, issues that concern the community at large. The issues here concern the conduct of several police officers, policies and attitudes of the police department toward minorities and gays, and the rights of some of the victims of Dahmer's madness. This decision will address some of the issues presented in the cases.

1. He was not charged with killing Steven Tuomi in Milwaukee in 1987. He is charged with killing Steven Hicks in Bath Township, Ohio, in 1978.

The telephone call for help on May 27 was made from a phone booth just a half a block away from Dahmer's apartment. The subject of the call was Konerak Sinthasomphone, a 14–year–old Laotian boy. Later that evening, after the police had responded to the call and determined that nothing was amiss, Dahmer killed Sinthasomphone. He went on to kill others, including Matt Turner in June, Jeremiah Weinberger in early July, and Oliver Lacy and Joseph Bradehoft in mid-July. He terrorized Tracy Edwards before Edwards escaped and led the police to Dahmer, who was finally arrested on July 22, 1991. After the arrest, Dahmer confessed to 17 murders.

The estate of Konerak Sinthasomphone and his family have filed a lawsuit claiming that the police officers and the City of Milwaukee violated their constitutional rights. Catherine Lacy, Oliver Lacy's mother; Cheryl Bradehoft, Joseph Bradehoft's wife; Sarah Mae Bradehoft, his daughter; and Tracy Edwards are plaintiffs in the other lawsuits. The defendants include Joseph Gabrish, John Balcerzak, and Richard Porubcan, the three Milwaukee police officers who responded to the May 27 call, and the City of Milwaukee itself. The defendants have moved to dismiss the cases, under rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the complaints fail to state claims upon which relief can be granted.

After discussing the controlling law, I ended my March 5, 1992, decision by dismissing the lawsuits filed by the Bradehofts, Ms. Lacy, and Mr. Edwards for failure to state claims upon which relief could be granted. The Sinthasomphone case[2] survived the rule 12 motion to dismiss.

So what remains in this case are the claims of Sinthasomphone[3] against Officers Gabrish, Balcerzak, and Porubcan and the claim against the City of Milwaukee. The claim against the city alleges a violation of the equal protection clause of the 14th amendment to the United States Constitution.

Against the three officers, Sinthasomphone alleges a violation of the equal protection clause and, in the major allegation in the case, violations of substantive provisions of the due process clause of the 14th amendment. The three officers have now moved for summary judgment dismissing the due process claim against them. In their motion, the officers argue that they have a qualified immunity from suit. This decision will address the officers' motion for summary judgment.

To properly address the motion for summary judgment I must again return to the facts, most of which are undisputed. Jeffrey Dahmer met Konerak Sinthasomphone at the Grand Avenue Mall in Milwaukee on the afternoon of May 26, 1991. Sinthasomphone was 14 years old, 5'3" tall, and weighed 110 pounds. He was Laotian and spoke English as well as Laotian. Dahmer offered to pay Sinthasomphone to go home with him so Dahmer could take nude or semi-nude pictures of him. The two proceeded to Dahmer's apartment at 924 North 25th Street in Milwaukee, where Dahmer did, in fact, take pictures of Sinthasomphone. Dahmer offered Sinthasomphone a drink, which was laced with Halcion. Sinthasomphone fell into a deep sleep, during which Dahmer, according to his deposition testimony, drilled a small hole in Sinthasomphone's head. He then poured diluted hydrochloric acid into the hole. Dahmer claims that he did this sort of thing in an attempt to induce a "zombie-like state" which would allow him to control his victims, including Sinthasomphone.

During the early morning hours of May 27, while Sinthasomphone was drugged, Dahmer left his apartment to buy beer. While he was gone, Sinthasomphone somehow managed to leave the apartment and find his way to the street, where he was seen by, among others, young women named Sandra Smith and Nicole Childress.

At 25th and State, Smith saw a person she describes as a Chinese boy, running naked from State Street toward an alley next to her

---

**2.** Except for the claims of Konerak Sinthasomphone's brothers and sisters.

**3.** I refer to the claims of the estate of Konerak Sinthasomphone and the claims of the parents collectively as the claims of "Sinthasomphone."

mother's apartment at 936 North 25th Street. The boy fell to the ground. Smith thought he was 11 or 12 years old; he had, she says, scrapes on his knees, buttocks, and right shoulder and what appeared to be blood running down his inner thigh from his buttocks. Smith asked Childress to call the police.

While Childress was telephoning, a white male, who turned out to be Dahmer, approached Smith and told her he was Sinthasomphone's friend. He said that Sinthasomphone had a habit of getting drunk on weekends. Smith suspected that Dahmer had caused some of Sinthasomphone's injuries. Dahmer began to lead Sinthasomphone away, with Sinthasomphone trying to break free.

Before they got far, police officers Gabrish and Balcerzak arrived. They were responding to the following dispatch:

36, you got a man down.

Caller states there's a man badly beaten and is wearing no clothes, lying in the street. 2–5 and State. Anonymous female caller. Ambulance sent.

The officers began to assess the situation. It appeared to Gabrish that Dahmer was assisting Sinthasomphone in walking. The officers say there was no sign that Sinthasomphone was trying to break away from Dahmer.

Balcerzak stayed with Dahmer while Gabrish questioned Sinthasomphone. Sinthasomphone did not answer questions. Dahmer, who unknown to the officers was obviously trying to avoid detection, was calm, courteous, and helpful; he responded politely. He gave Balcerzak his name, date of birth, and employment identification. He told Balcerzak that Sinthasomphone was a house guest who drank too much. He said Sinthasomphone's name was John Mung and that he was 18 or 19 [4] or 19 or 20 [5]. Balcerzak repeated questions in an attempt to determine Dahmer's truthfulness; his answers remained consistent.

A few minutes after Balcerzak and Gabrish arrived, another squad came to the scene. Officers Richard Porubcan, also a defendant here, and Pete Mozejewski were providing "informal backup" to Balcerzak and Gabrish.

The officers decided to take Sinthasomphone and Dahmer back to Dahmer's apartment. Either because Sinthasomphone stumbled or because he was resisting, Gabrish and Porubcan physically escorted him. They entered the rear of the apartment building and went to Dahmer's apartment. Once inside Dahmer's apartment, the officers saw no signs of any assault, struggle, or conflict. The officers found Sinthasomphone's clothing and saw colored, almost nude photographs of Sinthasomphone posing in a fashion which led them to conclude that Dahmer and Sinthasomphone had a consensual gay relationship. The photographs are reprinted here.

4. According to plaintiffs' proposed findings.

5. According to defendants' proposed findings.

The officers, thinking they had verified that Sinthasomphone belonged with Dahmer, left Sinthasomphone in the apartment. Dahmer killed Sinthasomphone some 30 minutes later.

Other facts which are not included in the parties' formal proposed findings of fact but which shed light on the situation are that the fire department ambulance arrived at the scene before the police. One of the rescue personnel thought Sinthasomphone needed treatment, but the ambulance crew was sent away by the police. When the police arrived, Sandra Smith says that she tried to give them information that Dahmer had called Sinthasomphone by different names and that Sinthasomphone was trying to escape from Dahmer. Rather than listening to her, an officer threatened her with arrest, and she left the scene. She went to the home of her mother, Glenda Cleveland. Ms. Cleveland called the police department later to inquire about the incident, and during her call she emphasized that the naked person taken from the scene was just a boy, not an adult.

The issue on the currently pending motion for summary judgment is whether, on these facts, the police officers are entitled to a qualified immunity from suit. In recent years, the doctrine of qualified immunity has expanded the protection it offers to police officers and other public officials. Today, the law is such that the existence of a qualified immunity from suit is almost the norm. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Police officers are immune from suit unless their conduct violates a clearly established right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court of Appeals for the Seventh Circuit has stated that immunity should be granted unless "it has been authoritatively decided that certain conduct is forbidden." *Alliance to End Repression v. Chicago*, 820 F.2d 873, 875 (7th Cir.1987), quoted in *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).

The possible application of these principles to the present issue was foreshadowed in my decision of March 5, 1992. I implied that the claim based on a violation of the equal protection clause, if proven, would violate clearly established law: "the cases uniformly emphasize that if police action—or even police inaction is a product of intentional discrimination, it violates the equal protection clause." At 1350. Recognizing this principle, the officers have not asked for a qualified immunity from the equal protection claim.

The claim of a substantive due process violation is more difficult to resolve. In referring to *Harris v. District of Columbia*, 932 F.2d 10 (D.C.Cir.1991), I stated at page 1350 of my March 5, 1992, decision:

> The court determined that the police officers were not under "a clearly established constitutional obligation to obtain medical care for Harris" based on a special relationship with him and that they therefore were entitled to a qualified immunity. The majority opinion indicated, however, that they were deciding the qualified immunity issue: whether an obligation was "clearly established," not whether a constitutional obligation existed. *A fine point, and one which will no doubt arise again in this case.* [Emphasis added.]

And now the issue has, in fact, arisen.

The three police officers in this case are entitled to qualified immunity unless their conduct violated Konerak Sinthasomphone's clearly established constitutional rights. A first step in the analysis is a determination of what his constitutional rights were. A discussion of those rights begins at pages 1347–48 of my prior decision. For the sake of completeness, I will repeat some of my analysis.

The analysis begins with *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In that case, the United States Supreme Court emphasized that the purpose of the Constitution "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 S.Ct. at 1003. Joshua DeShaney, who was 5 years old, was beaten and rendered profoundly retarded by his father, with whom he lived. Social workers and other local officials had received complaints that the father was abusing the boy, but they did not remove him from his father's custody. After he was beaten for the last time, Joshua and his mother brought a case in this court, pursuant to 42 U.S.C. § 1983, alleging that Joshua's substantive due process right to liberty was abridged when the officials failed to intervene to protect him from his father. The United States Supreme Court ultimately held that the State's failure to protect an individual against private violence does not constitute a violation of the due process clause.

The Court also rejected the contention that the state officials had entered into a "special relationship" with Joshua because the officials knew he faced a special danger from his father, proclaimed their intention to protect him, and thus had a duty to do so in a reasonably competent fashion. A special relationship exists, the Court said, when "the State takes a person into its custody and holds him there against his will ...", most often in a prison or mental hospital, not under circumstances like those present in *DeShaney*.

Similarly, in *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988), the court of appeals for this circuit upheld my dismissal of claims that a Racine Fire Department dispatcher had failed to send a rescue vehicle to a woman who later died. In *Ellsworth v. City of Racine*, 774 F.2d 182 (7th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574, the court of appeals upheld the dismissal of a claim that the Racine Police Department, after agreeing to provide protection to the wife of an undercover narcotics officer, failed to protect her from a beating by a masked assailant. *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir.1991), concerned a woman involved in an intense domestic violence situation who, accompanied by a deputy sheriff, returned to her estranged husband's trailer to retrieve her belongings and was killed by him. The court of appeals upheld the dismissal of a lawsuit against the county that deputy, relying on two factors: the State did not create the danger and it did not subject her *involuntarily* to an existing danger.

A few cases reach a contrary result in situations in which there is little room to misunderstand what the results of one's actions or inaction will be. In *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), a pre-*DeShaney* case, the court of appeals for this circuit determined that Chicago police violated the Constitution when they left three children, unattended, in a car on the Chicago Skyway after arresting the adult who had been driving the car in which the children were riding. After exposure to the cold, the children left the car, crossed eight lanes of freeway traffic, and wandered around on the roadway at night searching for a telephone.

In *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990), a 12–year–old boy slipped into the water of Lake Michigan. A friend summoned help, and within 10 minutes two lifeguards, two fire fighters, one police officer, and two civilians, who were scuba-diving nearby, responded. However, before any rescue attempt could begin, a Lake County deputy sheriff arrived in a marine patrol boat. He insisted on enforcing an agreement between the city of Waukegan, Illinois, and Lake County, Illinois, which required the county to provide all police services on Lake Michigan. Pursuant to that agreement, the sheriff had promulgated a policy that directed all members of the sheriff's department to prevent any civilian from attempting to rescue a drowning person and contemplated that only divers from the city of Waukegan Fire Department could perform rescues. The deputy ordered all rescue attempts to stop. When the civilian scuba divers offered to attempt a rescue at their own risk, the deputy threatened to arrest them. Twenty minutes later, 30 minutes after the first would-be rescuers had arrived, the officially authorized divers pulled the boy from the water. He later died. The court found that the complaint stated a claim against both Lake County and the individual deputy.

I concluded in my March 5, 1992, decision that "having dissected these cases, the Sinthasomphone plaintiffs have not merely alleged that the police officers failed to protect Konerak Sinthasomphone from Jeffrey Dahmer." At 1349. Rather, the plaintiffs framed their complaint in terms of the positive actions of the police. The comment on this point, of course, was limited to the nature of the defense motion under consideration at the time. That motion was a rule 12 motion to dismiss based on the facial inadequacy of the complaint. The present matter involves a fully developed rule 56 motion for summary judgment.

*Horton v. Flenory*, 889 F.2d 454 (3rd Cir. 1989), should now be added to the mix. Defendant Flenory was a former police officer and the owner of a private club. When his club was burglarized, he called a police officer with whom he had formerly served. Before the officer arrived, Flenory interrogated a former employee named Powdrill, whom he suspected to be the burglar, and Powdrill suffered a beating. After he arrived, the police officer did some investigation, but ultimately left Powdrill in the "good hands" of defendant Flenory. Powdrill then suffered another beating and died.

The police officer, in leaving Powdrill with Flenory, was acting under an official policy of the police department. The policy was to maintain a hands-off policy with respect to events transpiring in private clubs.

The court determined that *DeShaney* is "limited ... to situations in which the state is not involved in the harm, either as a custodian or as an actor." At 457. The court goes on to find that the defendants in that case were entitled to judgment notwithstanding the verdict "only if Mr. Powdrill's death occurred at a time when he was entirely outside state custody and only if that death was not the result of an official policy." At 458. The court found that Powdrill was in the custody of defendant Flenory, who was exercising a "delegated state function." At 458.

■ In my decision of March 5, 1992, I said that "the *DeShaney* doctrine is not without some small cracks in its surface; hairline, perhaps, but cracks nonetheless." At 1348. *Flenory* may be one, but in that case there is a finding that "custody" had been officially given to the private actor. In this case, I am not convinced that Sinthasomphone was "in custody" or in a "special relationship" with the three police officers. Not every person the police usher from one place to another is in custody or a special relationship with them. *See Ellsworth, Losinski,* and *DeShaney.*

In the March 5 decision I stated that the "line between *DeShaney* and *Ross* (the most favorable Seventh Circuit case supporting the plaintiffs' claims) may not be entirely clear, but it is discernable." At 1348. I spoke of courts "threading" their way through the maze. There very well may be a way to reconcile all of these cases and others which remain unmentioned, but it is not an easy task.

Recognizing that the issue is difficult almost compels the conclusion that the officers are entitled to a qualified immunity from suit. We must remember that the claims in this case are for violations of the United States Constitution, which primarily protects citizens from state *action.* If the police officers were the ones who killed Sinthasomphone, they would be liable. However, that is not what happened here. The dastardly acts were committed, we must remember, not by the officers but by Dahmer, a maniac of the first order.

Now, one might not necessarily disagree with those who say that the officers [6] did not do good police work: One could conclude that they did not listen to the witnesses; that they did not investigate as thoroughly as they should have; that they foolishly believed that Jeffrey Dahmer was telling them the truth; that they were callous; and that they were rude to Glenda Cleveland. But the issue in this case is not whether they were good or bad cops in general or during the evening of May 27, 1990. The issue instead is whether, under *clearly established constitution doctrine,* the officers were required to know that leaving Sinthasomphone with Dahmer would have dire consequences.

The best way to determine when a substantive due process right is clearly established—a **legal** issue—is to concentrate on the **facts.** As the court stated in *Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir.1992), "[q]ualified immunity is a legal issue, but it is one which, because of the particularity requirement, is bound up in the facts of a particular case." The relevant facts are those possessed by the officers at the time of the incident, not those which emerge after the situation turns out to be as wrought with horror as occurred here, or in *DeShaney.* In hindsight, of course, Sinthasomphone should not have been left with Dahmer. But one must look at what the police officers knew at the time. And what they knew and how they acted must be viewed in the real world of busy and stressful police work in urban America in the twilight of the 20th Century. Even assuming that the officers failed to do adequate police work, the situation was not sufficiently clear to allow the conclusion that they had to know the inevitable horror which would follow their actions. No one could have clearly known or suspected that Dahmer was a monster who killed and cannibalized his victims. The possibility that the man who willingly took the police to his apartment on May 27 would turn out to be a man whose name today is legendary in the

---

6. Gabrish, Balcerzak, and Porubcan did different things on that fateful night. When I refer to them collectively, I do so knowing that their individual involvement in all of the actions that took place that night were different.

annals of serial killers in America was at best a billion-to-one shot. The police were not, constitutionally, required to know or appreciate that the billion-to-one shot would come up on top.

Sometimes a danger is clear and obvious. *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir.1993), involved an intoxicated person whom a patrolman had allowed to have possession of a car and the car keys. Two hours later, that person slammed head on into another car, killing one of the passengers and injuring several others. Reversing a dismissal at the pleading stage, the court stated that *"[s]ome dangers are so evident,* while their victims are so random, that the state actors can be held accountable by any injured party." (Emphasis added.) The court focused on the nature of the danger: is the danger sufficiently evident that a reasonable officer should be held accountable to have understood it.

The danger in *Ross* was undeniably evident: anyone has to know the inevitable result of leaving someone under water for 30 minutes. On the other hand, one does not inevitably know that getting a naked person off the streets, taking him to an apartment where his clothes and near-naked pictures of him are present, and leaving him there with a person who convincingly presents himself as a friend will result in death and dismemberment.

In terms of the information available to the officers, this case is much more like *DeShaney* than *Ross.* If, in the face of all the information the state actors had, Joshua DeShaney enjoyed no constitutional right to protection, I cannot conclude that it is *clearly established* that Sinthasomphone had such a right. The officers are entitled to a qualified immunity. Summary judgment dismissing the due process claim against them is GRANTED. Only the claims alleging a denial of equal protection remain.