The ESTATE OF Konerak SINTHASOM-PHONE, by its special administrator, Anoukone SINTHASOMPHONE; Sounthone Sinthasomphone; and Somdy Sinthasomphone, Plaintiffs,

v.

The CITY OF MILWAUKEE, a municipal corporation; Joseph Gabrish; and John A. Balcerzak, Defendants.

Civ. A. No. 91–C–1121.

United States District Court, E.D. Wisconsin.

March 2, 1995.

148

Robert Slattery, Slattery & Hausman, Ltd., and Curry First, Lawrence G. Albrecht, First, Blondis, Albrecht, Bangert & Novotnak, S.C., Milwaukee, WI, for plaintiffs.

Rudolph Konrad, Deputy City Atty., Milwaukee, WI, for City of Milwaukee.

Philip Reid, Cook & Franke, S.C., Milwaukee, WI, for Balcerzak & Gabrish.

### ORDER

TERENCE T. EVANS, Chief Judge.

What follows is another chapter in the horrifying story of Jeffrey Dahmer. The result of this chapter is that a jury trial will be held to sort out whether, on May 27, 1991, Konerak Sinthasomphone's right to the equal protection of the law was violated based on race, sex, and sexual orientation by two Milwaukee police officers and by the customs and practices of the Milwaukee Police Department.

The facts which gave rise to this case have previously been recited in decisions on motions to dismiss the complaint and for dismissal on the basis of qualified immunity. *See Sinthasomphone v. City of Milwaukee,* 785 F.Supp. 1343 (E.D.Wis.1992); *Sinthasomphone v. City of Milwaukee,* 838 F.Supp. 1320 (E.D.Wis.1993). What remains are claims based on a violation of Sinthasomphone's right to the equal protection of the law.

### Motions for Summary Judgment

Briefly, the background facts, particularly as they relate to the equal protection claim, are that on the evening of May 27, 1991, young Sinthasomphone, a Laotian boy of 14, was seen wandering dazed and naked on the corner of 25th and State in Milwaukee, Wisconsin. Police officers, including the defendants Joseph Gabrish and John Balcerzak, arrived on the scene. Shortly thereafter, the

now-well-known serial killer Jeffrey Dahmer, a white man, arrived and explained to the police (who were also white) that Sinthasomphone was his friend and that he was drunk. Despite the vigorous protestations of several African–Americans on the scene, the officers and Dahmer led Sinthasomphone back to Dahmer's apartment, where the body of one of Dahmer's victims lay unnoticed in an adjoining room. Concluding that Dahmer and Sinthasomphone were adult homosexual lovers, the officers ultimately left Sinthasomphone with Dahmer. Thirty minutes later, he became Dahmer's thirteenth victim.

■ Both the City of Milwaukee and Officers Gabrish and Balcerzak, have filed motions for summary judgment. Summary judgment is appropriate only if there is "no genuine issue as to any material fact" and if the "moving party is entitled to judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating the motions, I must "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Lohorn v. Michal*, 913 F.2d 327 (7th Cir.1990). I may not weigh the evidence. *Anderson.*

In this case, many facts are not in dispute. The dispute is over the inferences to be drawn from the facts and over what facts are material. It is a dispute over what lens should be used to view the facts.

The City of Milwaukee and the officers want to view the Milwaukee Police Department and its policymakers as they existed in 1991 and later. The plaintiffs are willing to look at that view, but they have a wider lens: the customs and policies of the department as they have evolved over the years, reaching back particularly to the reign of former Police Chief Harold Breier.

■ When the plaintiffs look back, they see a department rife with discriminatory customs and policies. Even the City does not deny that there were problems. The City states in its brief that:

Chief Arreola has concluded that much needed to be done, and much still remains to be done, to mend community relations since the tenure of former Chief Harold Breier.

The City contends, though, that current Chief Philip Arreola, Mayor John Norquist, and former Fire and Police Commission Chairman M. Nicol Padway are opposed to discrimination and have taken steps to correct problems within the department. The City argues that in 1991 it was clearly against police policy to maintain discriminatory practices. The plaintiffs contend that whatever steps have been taken have not been sufficient to uproot deeply entrenched customs within the department, and that in 1991 discriminatory customs were still acquiesced in by the policymakers.

■ That is an issue which can only be resolved by drawing inferences from the facts. Evaluating motivation and intent is not something to be done on summary judgment. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). This is an issue for a jury. Furthermore, in evaluating the evidence, the factfinder must give close scrutiny to all circumstantial evidence. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

I will set out a sampling of facts which illustrate why a jury must decide whether a custom or policy, acquiesced in by the policymakers, caused the violation of Konerak Sinthasomphone's rights. These facts will also illustrate why a wider lens than the defendants use is the one through which this case must be viewed.

Harold Breier was police chief in the city of Milwaukee from 1964 until 1984. During his tenure, he was the sole policymaker for the department. In 1984, legislative changes were made, and the Board of Fire and Police Commissioners became the policymaker for the department. See § 62.50(1m), Wisconsin Statutes. The commission can delegate authority to the police chief; overall executive control is vested in the mayor.

One of the defendants, Joseph Gabrish, entered the Police Academy at the very end of Harold Breier's tenure as chief. Officer Gabrish stated in his deposition for this case that he held Chief Breier "in deep respect."

Robert Ziarnik was chief of police from September 6, 1984, through May 6, 1989. Defendant John Balcerzak entered the Police Academy in 1985, during the tenure of Chief Ziarnik.

During 1991, M. Nicol Padway was chairman of the Fire and Police Commission. John Norquist was then and is now the mayor of the city of Milwaukee. Philip Arreola was appointed chief of police, effective November 6, 1989, and remains in that position today. Chief Arreola was hired at least in part because he was an advocate of and knowledgeable about "community-oriented policing." That this was a change from the past can perhaps be illustrated by former Chief Breier's evaluation of community oriented policing: The police officer "doesn't have time for that crap." This evaluation appears in a report on police practices in Milwaukee. The report also noted that on the occasion of his 80th birthday, the former chief was quoted in *The Milwaukee Journal* as saying:

> When I was chief, we were relating to the good people, and we were relating to the other people too—we were throwing those people in the can.... I always said, "The good people of Milwaukee, they bought what the Department was selling."

Throughout the years there have been many warnings about problems within the Milwaukee Police Department. I will mention a few. In *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984), the United States Court of Appeals for the Seventh Circuit upheld a jury verdict finding that a 20–year conspiracy to cover up a shooting by white Milwaukee police officers was motivated by invidious discrimination against blacks. In 1972, the Wisconsin Advisory Commission to the U.S. Commission on Civil Rights found that "[t]he charge of racism among policemen is not a new one, nor one foreign to Milwaukee."

In 1979, the Office of Revenue Sharing conducted an investigation of the Milwaukee Police Department and determined that it had engaged in procedures and policies that adversely affected employment opportunities for black police officers. *See League of Martin v. City of Milwaukee,* 588 F.Supp. 1004 (E.D.Wis.1984). In 1981, consultants Dresner, Morris, Tortorello & Sykes Research found a substantial degree of racial polarization within the police department.

Ten years later, in 1991, a Fire and Police Commission study reported overt racism and sexism at the Policy Academy. Also in 1991, The mayor's Citizen's Commission on Police–Community Relations reported that several residents complained of "racist and homophobic attitudes and a general lack of respect" from police officers. In December of that year, Detroit Police Commissioner James Jackson and Jane White, director of the East Lansing Training Academy, reported a "rather serious polarization around race and gender issues."

In 1993, reporting on its study of the Milwaukee Police Department, the Police Foundation stated, "[T]here is institutionalized racism and sexism that needs to be openly discussed and dealt with." Mayor Norquist and Chairman Padway have both stated that they agree with the statement.

In November 1994, the Wisconsin Advisory Committee to the U.S. Commission on Civil Rights found that the Milwaukee Police Department has for the past two decades "manifested a police culture unsympathetic, and even antagonistic, in its dealings with minority communities of the City." The committee recommended that the chief of police and the Fire and Police Commission make a series of joint public statement decrying police incivility to the public, particularly the black community. The committee noted that once a "police culture is established, it is difficult to change." To change it, the committee recommended a clearly stated unambiguous policy against discriminatory practices.

■ The issue in this case can be viewed as whether sufficient efforts have been made to change allegedly prevailing discriminatory customs of the Milwaukee Police Department or whether the alleged discriminatory culture, policies, and customs were allowed to exist and whether, through intention or "deliberate indifference" [*City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ], they remained in effect in May

1991, when the officers left young Sinthasomphone in the care of Jeffrey Dahmer.

As the plaintiffs argue, a change in the policymaker does not necessarily effectuate a change in deeply entrenched *de facto* policies. These are issues which a jury will have to resolve by looking at the past as well as at the time of this incident to see what the policies were in 1991.

■ As to the individual officers, the issue is whether they acted in a discriminatory fashion. They say in their affidavits that they did not. However, because motive and intent are subject to proof only circumstantially, summary judgment is not often a useful tool to resolve these issues. *See Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). There is in this record, evidence from which a jury may be allowed to draw inferences to support the plaintiffs' case. The plaintiffs have a right to present their claims to a jury. I cannot, as a matter of law, deprive them of that right.

### Motions in ·Limine

Defendants Gabrish and Balcerzak have filed a motion to exclude the testimony of one of plaintiffs' designated expert witnesses, Stanley Smith. Mr. Smith would be called to provide expert testimony regarding the value of Konerak Sinthasomphone's loss of the enjoyment of life, or hedonic damages. There are several objections to the testimony: that Mr. Smith's theory and methodology cannot be tested or substantiated, have not received favorable peer review, have an unknown rate of error, and are not generally accepted by other economists. Furthermore, defendants argue, Mr. Smith's testimony will not assist the jury.

According to the plaintiffs, Mr. Smith has analyzed over 67 studies from which he concludes that economists seeking to place a monetary value on human life have arrived at valuations between $1.5 million and $3 million, when their figures are converted to the value of the 1988 dollar. Mr. Smith himself places the value of life at $2.3 million as measured in 1988 dollars.

He then makes appropriate adjustments to (1) convert 1988 U.S. dollars to their present value, and (2) adjust the life expectancy of Konerak Sinthasomphone (59.1 years) as opposed to the 45–year average inherent in an economic model. ·He further finds nothing in the background or condition of this 14–year–old to require a downward adjustment.

His conclusion·is that the value of the life of Konerak Sinthasomphone in current United States dollars is in the approximate amount of $3.4 million.

The testimony of Mr. Smith has specifically been the subject of two reported cases in the court of appeals for this circuit. *Sherrod v. Berry* is a case which was ultimately considered *en banc* by the court. In the district court the plaintiffs prevailed. The district judge had admitted the testimony of Mr. Smith [629 F.Supp. 159 (N.D.Ill, 1985) ]. At first the court of appeals affirmed the judgment [827 F.2d 195 (7th Cir.1987) ]. The court was entirely uncritical of the admission of Mr. Smith's testimony; in fact, stated that the testimony was "invaluable" to the jury.

That decision was vacated [835 F.2d 1222 (7th Cir.1988) ] and the *en banc* decision followed [856 F.2d 802 (7th Cir.1988) ]. In the latter, the judgment of the district court was reversed. There was no discussion, however, of the testimony of Mr. Smith, and the court, in fact, stated that the district court should consider matter not discussed in the *en banc* opinion "in light of this court's prior discussion of those matters...." At 870, n. 5.

Then in a later case, *Mercado v. Ahmed,* 974 F.2d 863 (7th Cir.1992), the court upheld the decision of the district judge to exclude the testimony of Mr. Smith. The court stated that it was merely deciding that exclusion of the testimony was not an abuse of discretion. However, it is fair to say that this time, when the court looked at the issue of Mr. Smith's testimony, it was highly critical: "A witness who knows no more than the average person is not an expert." At 870. It damned with faint praise:

All this is not to imply that we can state conclusively that Smith's approach is devoid of any merit.

At 871.

Of course, both approaches the Seventh Circuit has taken regarding the testimony

must be reevaluated in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court has expressed its faith in the ability of district judges to separate the wheat from the chaff, guided by the question "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." At ——, 113 S.Ct. at 2796.

The problem with Mr. Smith's testimony is that he is attempting to quantify something which cannot truly be determined: what is the value of a human life? He rests his determination on a number of studies which are in themselves grounded in the science of economics—which, in the first place, is not quite like physics. Does this mean that his testimony will not assist the jury or will mislead them?

■ I am not, at this point, convinced of that. His testimony may conceivably be useful for the jury to have some starting point in their attempt to place a value on life. On the other hand, his testimony may be the kind of "junk" that should not be heard in a court of law. At trial, after a short offer of proof as to the nature of the testimony, I will make a final decision on whether this evidence can be presented. The plaintiffs may not make any reference to it in opening statement.

Defendants Gabrish and Balcerzak have also filed a motion to preclude expert testimony that they intentionally discriminated against Sinthasomphone. The motion will also be denied at this time. It involves issues which can only be considered once I hear the questions which the experts are asked.

IT IS THEREFORE ORDERED that the defense motions for summary judgment are DENIED.

IT IS FURTHER ORDERED that the motions to exclude testimony are DENIED at this time. They may be renewed at the trial.

IT IS FURTHER ORDERED that the attached pretrial order be complied with and a report filed by March 15, 1995. The trial will start, as scheduled, at 10 a.m. on March 21, 1995.

ATTACHMENT

## *PRETRIAL REPORT*

(effective January 1, 1992)

IT IS ORDERED that all parties prepare and file pretrial reports. Reports are due 10 days before the scheduled start of the trial or, if a final pretrial conference is scheduled, 3 days before the conference. The report must be signed by the attorney (or a party personally, if not represented by counsel) who will try the case. Sanctions, which may include the dismissal of claims and defenses, may be imposed if a trial report is not filed.

The report must include the following:

1. A short summary statement of the facts of the case and theories of liability or defense. The statement should not be longer than two pages.

2. A statement of the issues.

3. The names and addresses of all witnesses expected to testify. A witness not listed will not be permitted to testify absent a showing of good cause.

4. If expert witnesses are to be used, a narrative statement of the experts' background.

5. A list of exhibits to be offered at trial.

6. A designation of all depositions or portions of depositions to be read into the record at trial as substantive evidence. Reading more than five pages from a deposition will not be permitted unless the court finds good cause for permitting such readings.

7. Counsel's best estimate on the time needed to try the case.

8. If scheduled for a jury trial:

   a. All proposed questions that counsel would like the court to ask on voir dire.

   b. Proposed instructions on substantive issues.

   c. A proposed verdict form.

9. If scheduled for a court trial, proposed findings of fact and conclusions of law.

See rule 52 of the Federal Rules of Civil Procedure.

United States District Court
Eastern District of Wisconsin

In addition to completing a report, counsel are expected to confer and make a good faith effort to settle the case. Counsel are also expected to arrive at stipulations that will save time during the trial.