Herbert WALLACE, Plaintiff–Appellant,

v.

Charles ADKINS, Bernard Johnson, Ezra Scott, Larry Robinson, James Caldwell and Karl Swihart, Defendants–Appellees.

No. 96–3635.

United States Court of Appeals, Seventh Circuit.

Argued April 30, 1997.

Decided May 20, 1997.

Stephen A. Kray (argued), LaPorte, IN, for Plaintiff-Appellant.

James D. Dimitri (argued), Office of Attorney General, Indianapolis, IN, for Defendants-Appellees.

Before COFFEY, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The job of a prison guard is not an easy one, as this case illustrates. Herbert Wallace, a former guard at the Indiana State Prison, found himself assigned to duty in a cellhouse where a particularly violent inmate was housed, who had specifically threatened to kill Wallace. Although the inmate did not succeed in carrying out his threat, he did attack Wallace and stab him 13 times. Wallace brought this action under 42 U.S.C. § 1983 against a number of the prison officials, claiming that they violated his civil rights by failing to take preventive measures that would have protected Wallace. The district court found that the complaint failed to state a claim upon which relief could be granted. Although we sympathize with Wallace's plight, we conclude that the district court correctly found that the facts Wallace alleges do not state a substantive due process claim.

We accept the well pleaded facts in Wallace's complaint as true for purposes of our review of the state defendants' motion under Fed.R.Civ.P. 12(b)(6), *Reed v. Gardner*, 986 F.2d 1122, 1123 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). The story Wallace recounts began some years before the attack that forms the immediate basis of his claim. At that (unspecified) time, inmate Rosalio Hernandez

stabbed and killed another inmate. Wallace was the guard who subdued Hernandez. As he did so, the angry Hernandez promised that he would kill Wallace when he got the chance. After this incident, the prison officials kept Hernandez and Wallace separated, until the morning of March 23, 1994. On that day, Wallace was dismayed to see that he had been assigned to the Prison's D Cellhouse, also known as the "Predator Cellhouse" because of the violent nature of most of its occupants.

At approximately 8:00 a.m., Wallace discovered that Hernandez was housed in D Cellhouse. He immediately asked to be separated from Hernandez (although he does not specify to whom he made this request or the manner in which he communicated it). He does claim, however, that all of the defendants were both aware of his history with Hernandez and aware of his request. Notwithstanding the danger he faced, the defendants "required him to stand his post, and made assurances, which he relied upon, that they were taking action to prevent Rosalio's coming into contact with him." These assurances proved to be false. The defendant prison officials took no protective action at all, and at 10:30 a.m. Hernandez attacked Wallace and stabbed him 13 times.

Wallace claimed that one of the defendants, Charles Adkins, had expressed ill-will toward him at various times before the day of the attack. Adkins had told Wallace that Wallace ought to quit his prison job and find work elsewhere. On the day of the attack, Adkins criticized a nurse for giving Wallace emergency care. Wallace claimed that Adkins either intentionally allowed Wallace to remain in a life-threatening situation, knowing that Hernandez would physically injure him or kill him, or that Adkins was deliberately and callously indifferent to Wallace's safety. With respect to the other defendants, Wallace alleged that they all had the authority to take immediate action to prevent him from having physical contact with Hernandez. Their inaction and their affirmative decision to deny Wallace's request for immediate segregation from Hernandez, coupled with their knowledge of the dangerous situation, also amounted to deliberate and callous indifference or reckless disregard of Wallace's alleged 14th Amendment right not to be kept in an unreasonably dangerous situation.

The district court analyzed Wallace's claim exclusively under the substantive due process component of the 14th Amendment. It found that the 8th Amendment did not apply to his case, as it governs only the relationship between the state and persons who are being "punished" somehow; it has no application to the government's relationship with its non-inmate employees. For 14th Amendment purposes, the court found the case controlled by *Walker v. Rowe*, 791 F.2d 507 (7th Cir. 1986), in which this court rejected a similar claim brought by prison guards and their survivors in the aftermath of a prison riot. On the facts alleged by Wallace, the district court concluded that the government agents had neither prevented Wallace from receiving help from private persons, as in *Estate of Sinthasomphone v. City of Milwaukee*, 785 F.Supp. 1343 (E.D.Wis.1992), nor had it used governmental authority to prevent Wallace from protecting himself, as in *Camp v. Gregory*, 67 F.3d 1286 (7th Cir.1995), and *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990). The court noted at the end of its opinion that the complaint did not raise any state law claim of a common law duty to provide a safe working environment.

■ Because the parties do not dispute that the defendants were acting under color of state law when the stabbing occurred, this case turns on whether Wallace has alleged a violation of a right secured by the 14th Amendment. *See, e.g., Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 471 (7th Cir.1997). The only such right that could apply here would be the substantive component of the due process clause, which "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quotation omitted).

To the extent that Wallace's claim rests on an alleged affirmative duty of the state to ensure the safety of its employees or its citizens, it runs against the obstacles created

by *Collins* and by *DeShaney v. Winnebago County Dep't of Soc. Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Both *Collins* and *DeShaney* make it clear that the due process clause imposes no general affirmative duty to protect on the state, nor does it guarantee public employees a workplace free of unreasonable risks of harm. *See Collins,* 503 U.S. at 126, 129, 112 S.Ct. at 1068, 1070; *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1002. Wallace attempts to overcome this problem with two arguments: first, he claims that, as a prison guard with a duty to stay at his post, he had a "special relationship" with the state analogous to others that have given rise to an affirmative duty to protect; and second, he argues that the state defendants' decision to deny him permission to leave his post took this case out of the "inaction" paradigm of *DeShaney* and *Collins* and put it in the more traditional category of cases where state action is at issue.

Both these arguments in the end depend on different aspects of the question whether Wallace had the kind of special relationship with the State of Indiana that gives rise to an affirmative duty of care and protection on the part of the state. *See generally DeShaney,* 489 U.S. at 198, 109 S.Ct. at 1005. In *Estate of Stevens v. City of Green Bay,* 105 F.3d 1169 (7th Cir.1997), this court summarized the situations in which the Supreme Court has recognized such a relationship as follows: "(1) custodial settings in which the state has limited the individual's ability to care for himself, and (2) when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced." 105 F.3d at 1174 (*citing DeShaney,* 489 U.S. at 199–202, 109 S.Ct. at 1004–1006). Wallace argues that he meets both these criteria, because the state, by requiring him to stand his post, limited his ability to care for himself, and because the decision of the officials *not* to allow him to leave D Cellhouse immediately amounted to an affirmative act that placed him in a position of danger he would not otherwise have faced.

As the district court recognized, the case that addresses most directly the question whether this kind of special relationship exists between the state and its prison guards is *Walker v. Rowe,* 791 F.2d 507 (7th Cir. 1986). In *Walker,* prison guards who had been injured and the estates of guards who had been killed during a prison riot sued various prison officials under § 1983. Even under the assumption that the prison officials knew that they had taken actions that increased the risk of injury to the guards and had been grossly negligent in failing to reduce those risks, this court found that the guards' complaint did not state a substantive due process claim. *Id.* at 509. It emphasized several factors: first, governments must always make choices about how much to spend on safety measures and how much to spend on other worthy public causes (and courts are ill-equipped to second-guess those choices); second, the guards freely chose this line of employment and were free to resign at any time; and third, the due process clause does not assure safe working conditions for public employees.

Although Wallace did not attempt to distinguish *Walker* in his brief (which did not even cite this court's opinion in the case), at oral argument his lawyer suggested that the *Walker* rule applied only where the plaintiffs made a general claim of unsafe conditions. In Wallace's case, the prison officials knew of a particularized threat from Hernandez directed at Wallace himself. In those circumstances, Wallace had a right to protection. He also argued that Wallace's duty to stay on his post was the equivalent of the custodial setting described in *DeShaney, Estate of Stevens,* and *Camp* and thus gave rise to an affirmative duty to protect him.

Taking the latter point first, we see no relevant difference between Wallace's duty to remain on his post and the duty of the guards in *Walker.* In both instances, once the guards had taken the job, they had an obligation to be in a dangerous place. The prison officials knew (by assumption in *Walker*) that the guards were in danger, yet the guards were not free to leave without some potential repercussions for their job. While we are aware that the risk of a job reprimand, or even firing, operates as a practical constraint on a person's actions, this is still a far cry from the custodial settings that normally give rise to a special duty on the state's

part. *Cf. Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (the state owes a special duty to incarcerated prisoners); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (the state owes a special duty to involuntarily committed mental patients). Unlike a prisoner, a person involuntarily committed to a mental institution, or a child placed by state authorities in a foster home, Wallace was free to walk out the door any time he wanted. This may seem to pose a harsh choice for prison guards, but the consequences of the opposite rule for prison administration generally would be even more unacceptable. Every time a warden knew that a dangerous situation was brewing, which imposed particular risks on certain guards, the warden would risk personal liability by ordering the guard to stay on his post. It would force wardens to make decisions about locating substitute personnel, often in urgent circumstances, knowing that a court might later second-guess a decision not to grant a request to be relieved. We therefore hold that prison guards ordered to stay at their posts are not in the kind of custodial setting required to create a special relationship for 14th Amendment substantive due process purposes.

■ We are similarly unpersuaded that the prison officials here affirmatively placed Wallace in a position of danger he would not otherwise have faced. There are two parts of this inquiry: what actions did the prison officials affirmatively take, and what dangers would Wallace otherwise have faced? The only affirmative act Wallace can point to is the order to remain on his post, which (on this appeal from a Rule 12(b)(6) dismissal) we assume the prison officials issued with full knowledge that Hernandez was a vicious murderer who was ready to strike Wallace at the first opportunity, which had just presented itself. We must also assume, as Wallace alleges, that upon receiving Wallace's request to be moved, the prison officials did nothing but offer the false assurances that they would protect him. The issuance of this order is enough to qualify as an affirmative act on the part of the officials. As Wallace noted at oral argument, it is quite different from a generalized complaint that D Cellhouse is a dangerous place.

But Wallace fails on the second part of this inquiry. His real complaint is that the prison officials did not take a different affirmative step, namely, issuing an order permitting him to leave. However, the question is not what dangers he would have faced had the prison officials behaved as he wanted them to, but what dangers he would have faced absent the affirmative acts actually taken. Even without the actual order that was issued, Wallace would have had a duty to remain on his post whether or not the prison officials said a word. There is no doubt that he was in danger from Hernandez on the morning of March 23, 1994, and that the officials knew of the danger even before Hernandez tried to make good on his threat. But these are the risks of the guard's job.

The rationale of *Walker* compels us to hold here that the due process clause did not require the prison officials to issue an order permitting him to leave. Whether or not Wallace would have had a remedy under state law, apart from his worker's compensation payments, we do not know, nor were the attorneys at oral argument able to enlighten us. As for the case before us, we AFFIRM the district court's judgment dismissing Wallace's claims.