

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-2-2006

# Kaucher v. Bucks County

Precedential or Non-Precedential: Precedential

Docket No. 05-1598

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Kaucher v. Bucks County" (2006). *2006 Decisions.* Paper 541.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/541

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-1598

_____

JOHN KAUCHER; DAWN KAUCHER, H/W,
                                        Appellants

v.

COUNTY OF BUCKS;
MICHAEL FITZPATRICK, CHARLES MARTIN,
SANDRA MILLER, Individually and as
Bucks County Commissioners;
GORDIAN EHRLACHER, Individually and as
Director, Bucks County Dept. of Health;
HARRIS GUBERNICK, Individually and as
Director, Bucks Co. Dept. Of Corrections;
WILLIS MORTON, Individually and as
Warden, Bucks County Correctional Facility;
LEWIS POLK, M.D., Individually and as
Medical Director, Health Dept.;
JOAN CROWE, Individually and as Nurse, Health Dept.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 03-cv-1212
(Honorable Robert F. Kelly)

Argued February 14, 2006

Before:  SCIRICA, *Chief Judge*,
BARRY and FISHER, *Circuit Judges*

(Filed August 2, 2006)

DAVID RUDOVSKY, ESQUIRE (ARGUED)
Kairys, Rudovsky, Epstein & Messing
924 Cherry Street, Suite 500
Philadelphia, Pennsylvania 19107

MARTHA SPERLING, ESQUIRE
Silver & Sperling
107 North Broad Street, Suite 101
Doylestown, Pennsylvania 18901
        Attorneys for Appellants

FRANK A. CHERNAK, ESQUIRE (ARGUED)
Ballard Spahr Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
    Attorney for Appellees

---

## OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

John Kaucher, a corrections officer at the Bucks County Correctional Facility, and his wife, Dawn Kaucher, filed suit under 42 U.S.C. § 1983 against the County of Bucks and several County employees responsible for the operation of the Correctional Facility, alleging a violation of their substantive due process rights. The Kauchers contend they contracted Methicilin Resistant *Staphylococcus aureus* infections as a result of defendants' conscience-shocking behavior in creating unsanitary and dangerous conditions at the jail. The District Court concluded the Kauchers failed to establish a substantive due process violation and granted defendants' motion for summary judgment. For the reasons set forth, we will affirm.

## I.

Because this appeal comes to us from an order granting summary judgment in favor of defendants, we present and consider the facts in the light most favorable to plaintiffs. *See Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). John Kaucher was hired by the County of Bucks in 1999 as a corrections officer at the Bucks County Correctional Facility, a medium to maximum security jail in Doyleston, Pennsylvania. The jail employs approximately 170 corrections officers, who are responsible for supervising inmates at work locations and in housing units and for transporting inmates between institutions and to and from outside appointments. The job description notes that corrections officers will have daily contact with incarcerated individuals and warns that "[w]ork involves regular exposure to unpredictable conditions and occasionally requires the expenditure of physical effort in restraining and subduing prisoners." (Suppl. App. 141.)

The Pennsylvania Department of Corrections conducts annual inspections of the jail to ensure compliance with statutory standards. After the June 2002 inspection, the Department of Corrections reported the jail was in compliance with the state's standards relating to personal hygiene, sanitation, safety, clothing, and personnel. It issued recommendations for improvement with respect to findings of mold, peeling paint, rusted vents, and leaking roofs, but noted jail officials were making a "good faith effort" to address these issues. In 2003, an expert in prison conditions inspected the jail

and reported, among other things, problems with overcrowding, unsanitary conditions, food spoilage, and inadequate methods for handling contaminated clothing.

There had always been cases of inmates with skin infections at the jail, but in July 2002, the County Health Department noted an increase. The Health Department determined the infections were caused by Methicilin Resistant *Staphylococcus aureus* (MRSA), a drug-resistant strain of staph bacteria. MRSA is only susceptible to a limited number of antibiotics, but most MRSA skin infections can be treated without antibiotics by draining the sores.

MRSA can be spread through direct contact with infected individuals or through contact with materials that have been exposed to the bacteria. Conditions frequently associated with corrections facilities—including overcrowding, shared facilities, and close contact between inmates—can increase the risk of spreading. Unsanitary conditions can exacerbate the problem. The Kauchers contend the increase in skin infections among inmates during the summer of 2002 was the result of defendants' role in creating unsanitary and dangerous conditions at the jail.

Jail medical officials responded to the spread of infection by isolating infected inmates in single-occupancy cells. When single-occupancy cells were not available, infected inmates were isolated in a restricted housing unit, generally reserved for inmates with disciplinary problems. The Kauchers contend

these efforts were counterproductive because fear of isolation led many inmates to hide their infections.

One of the County's doctors recommended to two nurses at the jail that inmates be treated with a particular antibiotic proven effective in treating MRSA infections—vancomycin. The doctor was informed that the drug was too costly and that his recommendation should not appear in the jail's medical records. He later testified he believed a "cover-up" was in effect.

Kaucher contends the first infectious disease training he received was in late 2003. But he does not dispute receiving a copy of the jail's standard operating procedures when he was first employed in 1999. These procedures include policies for supervising hospitalized inmates and handling inmates with communicable diseases. They warn that "[e]very inmate should be considered potentially infectious for communicable diseases," (Suppl. App. 174), and advise corrections officers to wash their hands frequently and to wear gloves when coming into direct contact with inmates and their possessions.

Kaucher describes two incidents of transporting infected inmates to a hospital for treatment, one during the summer of 2001 and the other during the fall of 2002. These incidents involved handcuffing and shackling the infected inmates and assisting them in using the hospital's telephones and bathrooms. Kaucher contends that in both cases, he was not advised of the inmates' infections or of the risk posed to his own health.

On August 21, 2002, Harris Gubernick, the Bucks County Director of Corrections, issued a memorandum to "quell any concerns about MRSA," and to reassure inmates and jail employees that "the medical staff is aware of the situation and is working diligently to treat those who have been diagnosed." (App. Vol. II 160.) The memorandum stated, "there are NO known cases in the facility," but advised that "proper hygiene is always recommended" to prevent the spread of infection. (*Id.*) It also reproduced a fact sheet about MRSA from the Department of Health and Human Services' Centers for Disease Control and Prevention, describing colonization, infection, and methods of prevention.

On August 27, 2002, as part of an inmate class action suit contesting conditions of confinement at the jail, a Magistrate Judge ordered that all inmates and staff be screened for MRSA. The order only required testing for MRSA infection, but the jail tested for colonization as well. Colonization occurs when the bacteria are present in the body without causing illness or infection. According to the Centers for Disease Control and Prevention, staph bacteria, including MRSA, are "commonly carried on the skin or in the nose of healthy people," and at any given time, approximately 25% to 30% of people in the United States have staph bacteria colonized in their noses. (App. Vol. I 40.) Of the approximately 1,126 individuals who were tested for colonization, 32 inmates and two corrections officers tested positive. Though colonization does not require treatment, all of the inmates and corrections officers who tested positive were

7

immediately informed and treated to eradicate the colonized bacteria. At that time, Kaucher had no symptoms of an active MRSA infection. But he was given medicated ointment and advised to consult his personal physician.

In 2003, several inmates filed an action for damages against County and jail officials relating to MRSA infections they contracted at the jail. In January 2004, a jury returned a verdict for the plaintiffs. In sustaining the verdict, the District Judge determined the jury had a sufficient basis for concluding the defendants "through deliberate indifference allowed conditions in the facility that were likely to cause disease, injury, or suffering." *Keller v. County of Bucks*, No. 03-4017, 2005 U.S. Dist. LEXIS 4537, at *4 (E.D. Pa. Mar. 22, 2005). The district judge also determined the jury had a sufficient basis for concluding the defendants "knew of the MRSA infection spreading throughout the prison and failed to take necessary steps to minimize the number of inmates affected." *Id.* at *5.

In April 2003, Kaucher developed MRSA lesions on his chin and chest. He was treated surgically and received a 30-day course of antibiotics. Dawn Kaucher developed an infection earlier, in February 2002. She was hospitalized and received surgical treatment in March 2002 and again in September 2002. She was not employed at the jail, but an expert stated she most likely contracted MRSA from her husband.

On February 27, 2003, the Kauchers filed suit in the District Court for the Eastern District of Pennsylvania, alleging

8

substantive due process violations under 42 U.S.C. § 1983, state law fraudulent misrepresentation, Pennsylvania constitutional violations, and violations of the Family and Medical Leave Act of 1993. Defendants filed a motion for summary judgment, which was granted on all claims on February 7, 2005. The Kauchers appeal, on the sole basis of their § 1983 claim.

## II.

The District Court exercised jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3). We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order of summary judgment. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).

Summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998). In conducting our review, we view the record in the light most favorable to the

9

Kauchers and draw all reasonable inferences in their favor. *See Nicini*, 212 F.3d at 806.

## III.

Section 1983[1] provides remedies for deprivations of rights established in the Constitution or federal laws. It does not, by its own terms, create substantive rights. *Baker v. McCollan,* 443 U.S. 137, 145 n.3 (1979). To state a § 1983 claim, a plaintiff must demonstrate the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir. 1995). Accordingly, "[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has

---

[1]42 U.S.C. § 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

alleged a deprivation of a constitutional right at all.'"[2]  *Nicini*, 212 F.3d at 806 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998)).

The District Court characterized the Kauchers' claim as alleging defendants failed in their duty to provide a safe working environment for the jail's corrections officers.  Citing *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115 (1992), the District

---

[2]If we determined the Kauchers had alleged a deprivation of a constitutional right, we would proceed to determine (1) whether the individual defendants were entitled to qualified immunity, and (2) whether the County of Bucks could be held liable.  But the initial inquiry under the doctrine of qualified immunity and the doctrine of municipal liability asks whether the plaintiff asserted a violation of a cognizable constitutional right.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (qualified immunity); *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120 (1992) (municipal liability).  Because we conclude the Kauchers have not alleged a constitutional violation, our inquiry under both doctrines proceeds no further.  *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *Searles v. Se. Penn. Transp. Auth.*, 990 F.2d 789, 794 (3d Cir. 1993) ("[W]e need not reach the issue of whether [the municipal entity] could be held liable where, as here, we have concluded that no constitutional right was violated.").

11

Court noted the Due Process Clause does not guarantee certain minimal levels of workplace safety and security, nor does it impose federal duties analogous to those imposed by state tort law. (App. Vol. I 15.)  The District Court concluded that under *Collins*, the Kauchers had not alleged a deprivation of a constitutional right.

On appeal, the Kauchers acknowledge the failure to provide minimum levels of workplace safety does not support an actionable substantive due process claim.  But they contend their claim is not based on a right to safe working conditions at the jail.  Rather, it is based on defendants' "conscience-shocking" conduct in creating dangerous conditions that led to the spread of infection, in failing to offer sufficient medical treatment to infected inmates and corrections officers, and in misrepresenting the risks of infection.  They contend defendants should be held liable for this conduct under the state created danger doctrine.

For the reasons set forth, we agree with the District Court that the Kauchers fail to state a cognizable substantive due process claim.  Under the facts alleged, the Kauchers cannot establish defendants' conduct was conscience shocking, nor can they state a valid claim under the state created danger doctrine. At base, they claim defendants failed to provide a safe working environment at the jail, free from risk of infection.  *Collins* forecloses this claim as a basis for substantive due process liability.

12

**A.**

We begin our analysis with a review of *Collins,* where the Supreme Court established the principle—previously applied by lower courts—that the Constitution does not guarantee public employees a safe working environment. *See Collins,* 503 U.S. at 129. A city sanitation worker died of asphyxia after entering a sewer that lacked adequate ventilation. The decedent's widow, who was the representative of his estate, brought a § 1983 claim against the city for providing an unsafe work environment. She alleged that in failing to provide safety warnings and safety equipment at job sites and in failing to train employees to cope with the dangers of working in sewer lines and manholes, the city violated the decedent's "constitutional right to be free from unreasonable risks of harm to his body, mind and emotions and a constitutional right to be protected from the [city's] custom and policy of deliberate indifference toward the safety of its employees." *Id.* at 117 (quotation omitted).

The Court began by stressing the importance of "judicial self-restraint" in the area of substantive due process, "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Id.* at 125. Noting a need for "the utmost care" in expanding the scope of protection under the Due Process Clause, the Court focused on the nature of the constitutional right alleged by the plaintiff. *Id.* On a "fair reading" of the complaint, the Court found she alleged "the city deprived [her husband] of life and liberty by failing to provide

13

a reasonably safe work environment." *Id.* at 125–26. This claim advanced two theories: that the Constitution imposes a duty on the state to provide public employees with minimal levels of workplace safety, and that the City acted with deliberate indifference toward the safety of the decedent, constituting conscience-shocking, arbitrary government action. *Id.* at 126.

The Court dismissed the first theory by concluding "[n]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Id.* Citing *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189 (1989), the Court explained that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Collins,* 503 U.S. at 126 (quoting *DeShaney,* 489 U.S. at 195).

With respect to the second theory, the Court concluded the City's alleged deliberate indifference to the decedent's safety did not rise to the level of conscience-shocking, arbitrary government action. *Id.* at 128. The Court characterized the plaintiff's claim as a "fairly typical state law tort claim" that "[t]he city breached its duty of care to her husband by failing to provide a safe work environment." *Id.* It rejected this theory, noting, "we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Id.*

14

The Court's refusal to characterize the city's actions as arbitrary rested on other grounds as well—on "the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Id.* The Court reasoned that policy choices concerning resource allocation are best made by locally elected representatives and not by federal judges interpreting the Due Process Clause. *See id.* at 128–29.

The Kauchers note that notwithstanding *Collins*'s well-established principle that the Due Process Clause does not guarantee public employees a workplace free of risks of harm, an employee can allege a constitutional violation for an employer's behavior that "shocks the conscience." *See id.* at 125; *see also Fagan v. City of Vineland,* 22 F.3d 1296, 1304 (3d Cir. 1994) (en banc) (interpreting *Collins* as "unanimously reaffirm[ing] the viability of the 'shocks the conscience' standard"). The Kauchers contend their claim lies not in the deprivation of a right to a safe working environment, but rather in the deprivation of a right to be protected against conscience-shocking state behavior that affirmatively creates risks of harm—a right to be free from state created danger.

**B.**

In *Lewis,* the Supreme Court explained that "the core of the concept" of due process is "protection against arbitrary action," *County of Sacramento v. Lewis,* 523 U.S. 833, 845 (1998), and that "only the most egregious official conduct can

15

be said to be arbitrary in the constitutional sense," *id.* at 846 (quotation omitted). The Court further explained, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847 (quotation omitted). Accordingly, in a substantive due process challenge to an action taken by an executive branch official, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8; *see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 399–400 (3d Cir. 2003) ("[O]ur cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience.").

But "the measure of what is conscience shocking is no calibrated yard stick," *Lewis,* 523 U.S. at 847, and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," *id*. at 850. The question of whether a given action "shocks the conscience" has an "elusive" quality to it. *Estate of Smith v. Marasco* (*Smith I*), 318 F.3d 497, 509 (3d Cir. 2003). At one end of the spectrum of culpable conduct, negligent behavior can never rise to the level of conscience shocking. *See Lewis,* 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). At the other end of the spectrum, actions "intended to injure in some way

16

unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level." *Id.* Acts that fall between the extremes of mere negligence and harmful intent require courts to make "closer calls," based on a context-specific inquiry. *Id.*

Because the "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999), we evaluate the conditions under which a defendant acted in order to ascertain the relevant standard of culpability. *See also Smith I*, 318 F.3d at 508 ("[O]ur cases have repeatedly acknowledged . . . that the meaning of [the shocks the conscience] standard varies depending on the factual context.") (quoting *United Artists*, 316 F.3d at 399–400). Where a defendant is "confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim." *Estate of Smith v. Marasco* (*Smith II*), 430 F.3d 140, 153 (3d Cir. 2005) (quotations and citations omitted). Where a defendant has "the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience." *Id.* (quotations and citations omitted); *see also Nicini*, 212 F.3d at 810. Where a defendant has to act with some urgency, but does not have to make split-second decisions—such as when a social worker attempts to remove a child from the parents' custody—the defendant's actions must "reach a level of gross negligence or arbitrariness that indeed

17

'shocks the conscience.'" *Miller*, 174 F.3d at 375–76; *see also Smith I*, 318 F.3d at 509 ("[E]xcept in those cases involving either true split-second decisions or . . . those in which officials have the luxury of relaxed deliberation, an official's conduct may create state-created danger liability if it exhibits a level of gross negligence or arbitrariness that shocks the conscience."); *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002) ("[W]e understand *Miller* to require . . . proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result.").

Here, both parties characterize defendants' decisions at the jail as evolving over a period of more than two years. They agree the appropriate standard is deliberate indifference. We note defendants were under some pressure to respond quickly to the spread of infection, and we question whether deliberately indifferent conduct is truly conscience shocking in this context.[3]

---

[3]In *Lewis,* the Court identified deliberate indifference as the appropriate standard for holding prison officials liable for their role in creating unsafe conditions of confinement. The Court noted this standard "rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *County of Sacramento v. Lewis,* 523 U.S. 833, 853 (1998). The Court then explained deliberate indifference would not form the basis for liability where a prisoner's claim arose from a response to a prison riot

18

or other violent disturbance. "In this setting, a deliberate indifference standard does not adequately capture the importance of . . . competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 852 (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).

Here, defendants had much more time to deliberate than they would in responding to a prison riot. But their decisionmaking was neither "unhurried" nor "largely uncomplicated by the pulls of competing obligations." *Id.* at 853. Defendants faced time pressure to contain the spread of infection. They faced competing obligations with respect to financial and space resources and with respect to the need to warn and educate inmates and staff without creating undue alarm. Accordingly, we think the appropriate standard may be higher than deliberate indifference. We note that at least one of our sister courts of appeals has indicated a higher standard of culpability may be required where a defendant's decisionmaking relates to workplace conditions. *See White v. Lemacks,* 183 F.3d 1253, 1258 (11th Cir. 1999) ("Although *Lewis* leaves open the possibility that deliberate indifference on the part of government officials or employees will 'shock the conscience' in some circumstances, . . . it is clear after *Collins* that such indifference in the context of routine decisions about employee or workplace safety cannot carry a plaintiff's case across that high threshold.")

19

But because we hold defendants' conduct was not even deliberately indifferent, we need not reach the question of whether a higher standard of culpability would be necessary to shock the conscience here.

In a suit challenging prison conditions under the Eighth Amendment, the Supreme Court has equated the concept of deliberate indifference with the criminal law concept of recklessness.[4]  *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").  The Court rejected the "invitation to adopt an objective test for deliberate indifference," holding

> a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

(citation omitted).

[4]But in the context of municipal liability, the Court has defined deliberate indifference as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

*Id.* at 837.

In *Nicini*, we recognized that *Farmer*'s subjective deliberate indifference standard did not necessarily apply in other contexts, but we "note[d] that after *Farmer* the courts of appeals have shown a tendency to apply a purely subjective deliberate indifference standard outside the Eighth Amendment context." *Nicini*, 212 F.3d at 812 n.10 (citing cases). Because the defendants' conduct in *Nicini* did not satisfy either standard, we concluded there was no need to determine "whether an official's failure to act in light of a risk of which the official should have known, as opposed to failure to act in light of an actually known risk, constitutes deliberately indifferent conduct in this setting." *Id.* at 811. In dicta in *Ziccardi v. City of Philadelphia,* we expressed approval of a subjective standard, describing deliberate indifference as requiring "that a person consciously disregard 'a substantial risk of serious harm.'" 288 F.3d at 66 (quoting *Farmer,* 511 U.S. at 836).[5]

---

[5]We have expressed approval of a subjective standard of deliberate indifference in other § 1983 substantive due process cases as well. *See, e.g., Schieber v. City of Philadelphia*, 320 F.3d 409, 421 (3d Cir. 2003)*; Natale v. Camden Cty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003). But we have not yet definitively answered the question of whether the appropriate standard in a non-Eighth Amendment substantive due process case is subjective or objective. An objective standard would move the concept of deliberate indifference, which lies

21

Here, under either a subjective or an objective standard, defendants' conduct does not exhibit deliberate indifference to a serious risk of prison officials contracting MRSA infections. There is no evidence that at the time defendants made their decisions as to conditions at the jail, they were aware, or should

---

"somewhere between the poles of negligence at one end and purpose or knowledge at the other," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994), closer to the pole of negligence. Mindful that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Lewis*, 523 U.S. at 849, and that the Supreme Court has expressed its "reluctan[ce] to expand the concept of substantive due process," *Collins*, 503 U.S. at 125, we hesitate to do so. But we recognize the *Farmer* standard was applied in an Eighth Amendment context. In the context of municipal liability, the Court has held the appropriate standard is objective. *See, e.g., Brown,* 520 U.S. at 410–12; *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The Court has also observed that actual knowledge can be inferred if a risk is obvious, *see Hope v. Pelzer,* 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.") (citing *Farmer*, 511 U.S. at 842–43), which sounds much like a modified objective standard. We recognize strong arguments weighing in favor of both standards. But because the conduct in this case was not deliberately indifferent under either a subjective or objective standard, we need not decide this issue.

22

have been aware, that their remedial and preventative measures were inadequate to protect corrections officers from infections. We note the Department of Corrections found the jail substantially in compliance with state standards in 2002, giving defendants reason to believe the measures were adequate. Because only two of 170 corrections officers tested positive for colonization in 2002, we think defendants could reasonably believe the corrections officers did not face a great risk of infection. And we think no reasonable jury could conclude defendants knew, or should have known, the corrections officers faced a substantial risk.

Furthermore, defendants had in place policies and procedures to ensure sanitary conditions in the jail, including requirements that cells be regularly cleaned with an all-purpose detergent and that showers be disinfected with a bleach and water solution. After conducting their 2002 inspection, the Department of Corrections noted jail officials' good faith efforts to improve conditions. When defendants recognized an increased number of MRSA infections, they took various remedial and preventative measures, including isolating and treating infected inmates and distributing information to staff and inmates. In retrospect, these actions may have been insufficient to prevent the Kauchers' infections. But we evaluate defendants' decisions at the time they were made. *See DeShaney,* 489 U.S. at 202 (holding state's failure to protect a child from his father's violence, "though calamitous in hindsight," did not constitute a due process violation); *Nicini*,

23

212 F.3d at 814 (explaining that "second-guess[ing]" the plaintiff's actions "from hindsight" is "not our task"). There is no indication that at the time the decisions were made, defendants were aware or should have been aware of the risks posed to corrections officers, or that they acted with deliberate indifference to those risks.[6]

---

[6]The Kauchers draw our attention to a jury verdict for inmates seeking to hold jail officials liable for their MRSA infections, and to the district judge's opinion in sustaining the verdict: "[t]here was ample evidence from which the jury could conclude that Defendants, including the County, knew of the MRSA infection spreading throughout the prison and failed to take necessary steps to minimize the number of inmates affected." *Keller v. County of Bucks*, No. 03-4017, 2005 U.S. Dist. LEXIS 4537, at *4–5 (E.D. Pa. Mar. 22, 2005). The Kauchers cite the jury verdict as evidence that defendants' deliberate indifference created and increased the risk of infection at the jail. They do not assert issue or claim preclusion. The jury verdict addressed conduct affecting inmates, not corrections officers. *Id.* at *2. The evidence the district judge noted in supporting the verdict included grossly inadequate medical treatment, a failure to keep the showers and food handling areas in a sanitary condition, and a failure to instruct inmates on prevention of infectious diseases. *Id.* at *3–4. These conditions did not affect corrections officers, who were free to seek outside medical treatment, who did not live in the jail, and who received detailed instructions on infectious

The Kauchers contend defendants acted with deliberate indifference in providing false and misleading information regarding the dangers of MRSA, and in covering up the extent of the problem. They further contend corrections officers were discouraged from taking preventative measures to protect themselves because of defendants' misrepresentations. This claim rests largely on Gubernick's memorandum, which states "there are <u>NO</u> known cases in the facility." (App. Vol. II 160.) Read in its entirety, the memorandum summarizes the situation at the jail as Gubernick understood it at the time it was issued, and warns inmates and staff to take appropriate precautions. The memorandum states, "[t]he medical staff is aware of the situation and is working diligently to treat those who have been diagnosed." (*Id.*) A reasonable jury could not conclude the memorandum was intended to mislead corrections officers as to the harm they faced. Nor could a reasonable jury conclude that by distributing it, Gubernick manifested deliberate indifference to a "substantial risk of serious harm" to corrections officers. *Ziccardi*, 288 F.3d at 66 (quoting *Farmer*, 511 U.S. at 836).

The Kauchers contend Gubernick should have issued a second memorandum when he realized there were, in fact, confirmed cases of MRSA infections at the jail. They contend his failure to do so evidences a "cover-up" of the problem, intended to allow defendants to avoid facing the financial and other costs of properly addressing the outbreak. In the absence

---

disease prevention in the jail's standard operating procedures.

of other evidence, and in light of the warnings and suggested precautions in Gubernick's memorandum, we do not think Gubernick's failure to issue a second memorandum could lead a reasonable jury to conclude that a cover-up was in effect or that Gubernick had engaged in conscience-shocking behavior. The first memorandum advised all inmates and staff of the MRSA issue, and of means of protection and prevention. In failing to update it with reports of diagnosed cases, Gubernick neglected to keep inmates and staff fully apprised of the details of the situation. But he did not misrepresent or cover up the situation.

The Kauchers note Dr. Lewis Brandt testified that he suggested infected inmates be treated with a particular antibiotic—vancomycin. He further testified he was informed vancomycin was too expensive, and that he should not put his recommendation in writing. The Kauchers contend this provides further evidence that defendants engaged in a "cover-up" of the problem. But Brandt testified that he made his recommendation to two nurses, only one of whom is named as a defendant. After both nurses rejected his suggestion, he did not discuss vancomycin with any other County or jail official. And at the nurses' instruction, he did not put his suggestion in writing. There is no evidence that any other defendant was aware of Brandt's suggestion. In light of this, there is insufficient evidence that defendants' decision to pursue treatment options other than vancomycin reveals a coordinated

26

"cover-up," designed to misrepresent the risk of infection faced by corrections officers.

Even assuming the jail might have been a safer place to work had defendants treated all infected inmates with vancomycin, defendants' failure to provide a workplace free from health risks cannot form the basis of a substantive due process claim. And even assuming defendants breached a duty to the inmates in failing to use vancomycin, there are well recognized differences between the duties owed to prisoners and the duties owed to employees and others whose liberty is not restricted. *See DeShaney,* 489 U.S. at 199–200; *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3rd Cir. 1995). A breach of a duty to a prisoner does not bear on duties owed to corrections officers, who are free to leave the jail at any time. Accordingly, even assuming defendants' failure to treat infected inmates with vancomycin increased the risk of infection faced by inmates and corrections officers, it does not form a valid basis for the Kauchers' substantive due process claim. We note that other Courts of Appeals have similarly concluded a failure to devote sufficient resources to establish a safe working environment does not violate the Due Process Clause. *See, e.g., White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999) ("[W]hen someone not in custody is harmed because too few resources were devoted to their safety and protection, that harm will seldom, if ever, be cognizable under the Due Process Clause."); *Walker v. Rowe,* 791 F.2d 507, 510–11 (7th Cir. 1986).

This case is distinguishable from the cases the Kauchers cite, in which deliberate misrepresentations formed the basis of substantive due process violations. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998) (holding a city's release of personal information that it promised would remain confidential increased undercover police officers' "vulnerability to private acts of vengeance," and formed the basis of a cognizable § 1983 claim); *L. W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir. 1992) (holding a prison supervisors' alleged promise to prison nurse that she would not be left alone with violent sex offenders could have "enhanced [the nurse's] vulnerability to attack," and therefore formed the basis of a cognizable § 1983 claim). Here, a reasonable jury could not conclude defendants deliberately or otherwise led the corrections officers to believe there was no MRSA issue at the jail, no risk of infection, and no need to take preventative measures.

This case is also distinguishable from cases cited as examples of conscience-shocking conduct in the workplace. In *Eddy v. Virgin Islands Water & Power Authority*, 256 F.3d 204 (3d Cir. 2001), the plaintiff was electrocuted after being ordered, without proper training, equipment, or protective clothing, to fix a high voltage electrical wire. The plaintiff had been threatened with discharge if he refused to perform the task. *Id.* at 213. We concluded the defendants knew the plaintiff "would face a risk of almost certain injury if he performed the work." *Id.* at 211 n.5 (quotation omitted). In *Hawkins v. Holloway*, 316 F.3d 777 (8th Cir. 2003), the defendant sheriff pointed loaded weapons at

28

employees, "deliberately abus[ing] his power by threatening deadly force as a means of oppressing those employed in his department." *Id.* at 787. In upholding the district court's denial of summary judgment for the sheriff, the Court of Appeals for the Eighth Circuit noted that while there is no constitutional guarantee of a safe workplace, "the sheriff's alleged conduct cannot be characterized as an unreasonable risk incident to one's service as an employee in a sheriff's department." *Id.* So, too, in *Eddy*, the danger faced by the plaintiff—working on a high voltage electrical wire without proper precautions—cannot be characterized as a safety risk inherent in the workplace. In both cases, by forcing the plaintiffs to confront unreasonable dangers at the risk of losing their jobs, the defendants engaged in "arbitrary and conscience shocking behavior prohibited by substantive due process." *Id.* Here, in contrast, the risk of contracting an infection was a "risk incident to [his] service as an employee" at the jail, *id.*, of which Kaucher was on notice from the outset of his employment. Moreover, there is no allegation that Kaucher was threatened with discharge if he failed to confront a particular danger at the jail.

We do not rule out the possibility that the evidence on the record could support a jury finding that defendants acted negligently. But the Kauchers have not alleged conduct that rises to a level of deliberate indifference that could be characterized as conscience shocking.

29

## C.

Nor have the Kauchers alleged a valid claim under the state created danger doctrine. Generally, the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens. *See DeShaney*, 489 U.S. at 195–96. But under the state created danger doctrine, the state may assume responsibility for the safety of an individual for whom it affirmatively creates or enhances a risk of danger. *See Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir. 1996). We require the following four elements of a meritorious state created danger claim:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to

the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (quotations and footnotes omitted). Because we conclude the Kauchers have not alleged conscience-shocking conduct on the part of defendants, their state created danger claim necessarily fails under the second element of this test.[7] Their claim also fails under the fourth element, because they have not

---

[7]Furthermore, "[i]n order to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights." *Estate of Smith v. Marasco* (*Smith II*), 430 F.3d 140, 151 (3d Cir. 2005). Here, the Kauchers have not alleged facts demonstrating personal involvement of any named individual defendant other than Gubernick, who they allege violated their substantive due process rights by issuing the memorandum regarding MRSA in the jail. Accordingly, the Kauchers cannot show that any other individual defendant "through conduct sanctioned under the color of state law, deprived [them] of a federal constitutional or statutory right." *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir. 2000). As for Gubernick, though the Kauchers allege specific conduct and involvement on his part, we conclude his actions in issuing the memorandum did not violate their constitutional rights.

alleged defendants acted affirmatively to create a risk of danger that would otherwise not have existed.[8]

The fourth element of the state created danger test asks whether a defendant exercised his or her authority to create a foreseeably dangerous situation. In *Bright*, we emphasized that "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."[9] 443 F.3d at 282. But

---

[8]In addition, Dawn Kaucher has not alleged a relationship with defendants such that she was a foreseeable victim. The third element of the test asks whether a plaintiff was part of a "discrete class of persons subjected to [a] potential harm." *Morse v. Lower Merion Sch. Dist.,*132 F.3d 902, 913 (3d Cir. 1997). Dawn Kaucher was not employed at the jail, and has no basis for asserting she was a foreseeable victim.

[9]We noted that "[i]f there were any inconsistency in the holdings of our prior cases regarding the fourth element of a state-created danger claim, the controlling precedent would be our *en banc* decision in *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*," where we affirmed *DeShaney*. *Bright v. Westmoreland County*, 443 F.3d 276, 283 n.6 (3d Cir. 2006). We explained: "the Due Process Clause proscribes only state action, and, accordingly, liability 'under the state-created danger theory [can only] be predicated upon the state's affirmative acts which work to plaintiffs' detriment in terms of exposure to danger.'" *Id.* (quoting *D.R. by L.R.*, 972 F.2d 1364, 1374 (3d

32

a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient. There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm. Only then will the affirmative act render the plaintiff "more vulnerable to danger than had the state not acted at all." *Id.* at 281; *see also Smith I,* 318 F.3d at 510 (holding the fourth element asks if "but for the defendants' actions, the plaintiff would have been in a less harmful position").

Accordingly, the fourth element is satisfied where the state's action was the "but for cause" of the danger faced by the plaintiff. In *Kneipp v. Tedder,* we concluded a jury could find this element satisfied where officers used their authority to separate an intoxicated woman from her husband and send her home unescorted. 95 F.3d at 1209. "[B]ut for the intervention of the police, [her husband] would have continued to escort [her] back to their apartment where she would have been safe." *Id.* In *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004), we concluded a jury could find this element satisfied where EMTs

---

Cir. 1992)). We concluded there was no conflict with cases in which the fourth element was phrased in terms of whether "'state actors used their authority to create an opportunity that would not otherwise have existed' for injury to the plaintiff" because "'state actors' cannot 'use their authority' to create such an opportunity by failing to act." *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)).

33

called for police backup in handling an allegedly dangerous individual coming out of a seizure and suffering convulsions, and then neglected to inform the police of the individual's medical condition. "Were it not for those acts, Mr. Rivas presumably could have remained in the apartment's bathroom for the duration of his seizure without incident." *Id.* at 197. In *Smith I*, we concluded a jury could find this element satisfied where police flushed plaintiff from his house using tear gas and other assaultive techniques, confined him to a densely wooded area, blocked his return, and prevented his family or friends from communicating with him over a loudspeaker. 318 F.3d at 509–10. We stated "it is 'conceivable that, but for the intervention of the police,' . . . Smith would have returned home on his own or with the encouragement of his family or friends." *Id.* at 510 (quoting *Kneipp*, 95 F.3d at 1209).

Where the state's action is not the "but for cause" of the plaintiff's harm, the fourth element is not satisfied. In *Morse v. Lower Merion School District,* 132 F.3d 902 (3d Cir. 1997), a teacher was killed in a daycare center, leased from the school district, after a mentally ill attacker entered through a door that had been unlocked by the center's operator. In analyzing her survivors' state created danger claim, the district court identified one arguably affirmative act—the defendants having unlocked the back door to a school through which the plaintiff's attacker entered—and expressed uncertainty as to whether this affirmative act was sufficient to establish liability. In concluding it was not, we noted the absence of a direct causal

34

relationship between the unlocking of the door and the plaintiff's attack by a mentally ill intruder. *See id.* at 915–16.[10]

The Kauchers have not alleged affirmative acts that were the "but for cause" of the risks they faced. They frame their claim in terms of actions affirmatively creating dangerous conditions and affirmatively misrepresenting dangers. But at base, both aspects of their claim allege failures to take actions sufficient to prevent the Kauchers' infections. In the first

---

[10]Other courts of appeals agree that under the state created danger doctrine, a defendant's actions must be the "but for cause" that put the plaintiff in a position of danger that otherwise would not have existed. *See, e.g., Penilla v. City of Huntington Park,* 115 F.3d 707, 710 (9th Cir. 1997) (finding a due process violation where the state created a danger to the plaintiff which, but for its affirmative acts, would not have existed); *Carlton v. Cleburne County*, 93 F.3d 505, 508 (8th Cir. 1996) (reviewing cases and noting due process violations were found where the plaintiffs "would not have been in harm's way but for the government's affirmative actions"); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir. 1993) (finding the evidence sufficient to support summary judgment for police officers where "without state intervention, the same danger would exist"); *Salas v. Carpenter,* 980 F.2d 299, 309 (5th Cir. 1992) (requiring evidence that the defendant left the plaintiff "in a worse position than if the state official had never been involved").

35

instance, they contend defendants failed to act affirmatively to improve conditions at the jail. In the second instance, they contend defendants failed to act affirmatively to educate and warn inmates and corrections officers about MRSA and to train them in infection prevention.[11]

Gubernick's issuance of the memorandum regarding MRSA is the one alleged act that might be characterized as affirmative. But the memorandum was not the "but for cause" of the Kauchers' infections. There had always been cases of staph infections at the jail, including MRSA infections, and there had always been a corresponding risk of infection to inmates and corrections officers. The increase in the number of infections in the summer of 2002 occurred prior to Gubernick's

---

[11]We have held failures to act cannot form the basis of a valid § 1983 claim. *See, e.g., Bright*, 443 F.3d at 283–84 (failure to hold revocation hearing for an individual in violation of his parole prior to his killing an eight-year old girl); *Morse,* 132 F.3d at 907–08 (failure to prevent mentally disturbed individual from entering school and attacking teacher); *Searles*, 990 F.2d at 794 (failure to maintain railcars in a safe condition); *D.R. by L.R..,* 972 F.2d at 1376 (failure of school officials to investigate and stop instances of sexual abuse of students); *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir. 1990) (failure to file criminal charges against individual who repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim and her family).

36

issuance of the memorandum. In fact, the memorandum was issued in response to the outbreak. Accordingly, the memorandum was not the "but for cause" of the outbreak or of the risk of infection faced by Kaucher. To the contrary, the memorandum instructed Kaucher as to appropriate measures to prevent an infection.

In contending defendants caused the outbreak, the Kauchers cite the jury verdict holding County and jail officials liable for the conditions that led to MRSA infections among inmates. But as noted, there are well recognized differences between the duties owed to prisoners and the duties owed to employees and other individuals whose liberty is not restricted. *See DeShaney,* 489 U.S. at 199–200; *Mark*, 51 F.3d at 1150. Regardless of whether omissions can form the basis of liability in a suit by inmates, they cannot form the basis of liability in the Kauchers' suit.

Though not based on the state created danger doctrine, *Wallace v. Adkins*, 115 F.3d 427 (7th Cir. 1997), supports our conclusion that the Kauchers' allegations do not satisfy the fourth element of the state created danger test. The plaintiff in *Wallace*, a prison guard, tried to remove his § 1983 claim from the *Collins* paradigm by alleging affirmative state action that led to his harm, as opposed to a lack of state action that led to unsafe conditions. He was assigned to duty in a prison housing a violent inmate who had threatened to kill him. The inmate attacked the plaintiff, and the plaintiff sought to hold a number of the prison officials liable. He alleged the prison officials

37

created his harm by ordering him to stay at his post and promising they would protect him against the inmate. The Court of Appeals for the Seventh Circuit, affirming the district court's dismissal of the complaint, concluded the plaintiff had not stated a valid substantive due process claim. *Id.* at 429–30. The court reasoned that once the plaintiff had taken a job as prison guard, his job obliged him to work in a dangerous place and concluded this was "a far cry" from the custodial relationships that normally give rise to a state duty under § 1983. *Id.* at 429. "Unlike a prisoner, a person involuntarily committed to a mental institution, or a child placed by state authorities in a foster home, [the plaintiff] was free to walk out the door any time he wanted." *Id.* at 430. By means of a two-part inquiry, the court addressed and answered the plaintiff's contention that *Collins* did not control, asking first what actions the prison officials affirmatively took and then what dangers the plaintiff would have faced in the absence of these actions. The affirmative acts the plaintiff alleged were the prison officials' order that he remain at his post and their promise to protect him from the violent inmate. The court concluded that even without these acts, the plaintiff would have had a duty to remain at his post and would have faced danger from the inmate: "[t]here is no doubt that [the plaintiff] was in danger from [the inmate] on the morning [in question], and that the officials knew of the danger even before [the inmate] tried to make good on his threat. But these are the risks of the guard's job." *Id.*

Here, too, Kaucher chose to remain employed at the jail, in a position that obliged him to work amidst MRSA infections. From the outset of his employment and well before Gubernick's memorandum was issued, he was aware of the safety risks associated with working in a prison. He was on notice of the jail's standard operating procedures, which described proper methods of handling inmates with communicable diseases. Moreover, with the exception of those related to Gubernick's issuance of his memorandum, all of the Kauchers' allegations relate to defendants' failure to take certain affirmative acts to increase safety standards at the jail. Just as in *Wallace*, these allegations of omissions are insufficient to trigger substantive due process liability.

The one alleged affirmative act was Gubernick's memorandum regarding MRSA. Under the second part of *Wallace*'s inquiry, we ask what dangers the Kauchers would have faced in the absence of the memorandum, and we conclude the dangers would have been the same. With or without the memorandum, jail employees risked MRSA infections. Had the memorandum actually represented there was no MRSA bacteria present at the jail, the Kauchers might have a claim that Gubernick effectively discouraged corrections officers from taking safety precautions and thereby created a risk for harm that would not otherwise have existed. But we have already concluded the memorandum did not constitute a misrepresentation of the MRSA problem.

Kaucher contends that when he transported infected inmates to the hospital, he faced specific opportunities for harm, created by defendants. He does not allege defendants forced him to perform this part of the job (i.e., that Kaucher objected and defendants insisted), that they forced him to perform it without taking proper preventative measures, or that they threatened to fire him if he declined. Even if defendants acted affirmatively in ordering Kaucher to perform these duties, the situation would be analogous to *Wallace.* Just as the *Wallace* plaintiff would have faced danger from the violent inmate whether or not he received a specific order to remain at his post, Kaucher would have faced the danger of contracting an MRSA infection whether or not he received an order to transport an infected inmate to the hospital. In both cases, "these are the risks of the guard's job." *Wallace*, 115 F.3d at 430.

The Kauchers have not alleged an affirmative, culpable act on the part of defendants sufficient to implicate the state created danger doctrine. Nor have they alleged conscience-shocking conduct on the part of defendants that could transform a workplace safety claim into a substantive due process claim. At base, the Kauchers contend defendants failed to provide a working environment free from risk of infection—a claim precluded by *Collins*.

**D.**

Our conclusion that the Kauchers' claims are precluded by *Collins* is informed and supported by the Court's admonition

that we refrain from importing traditional tort law into the Due Process Clause. This principle, emphasized in *Collins,* was established well before. *See, e.g., DeShaney*, 489 U.S. at 202 ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation."); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("Our Constitution . . . does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

In *Washington v. District of Columbia*, 802 F.2d 1478 (1986), the Court of Appeals for the D.C. Circuit focused on this principle in the relevant context of a prison guard's § 1983 claim against reformatory and local officials. The prison guard, who was attacked by a prisoner known to be psychologically unstable and violent, alleged the attack resulted from the reckless failure of prison officials to address unsafe conditions. The Court of Appeals, affirming the district court's dismissal for failure to state a claim, held the officials' failure to provide safe prison conditions did not form the basis of a substantive due process claim. *Id*. at 1481–82. The court noted that under state tort law, an employer may have a duty to provide, and an employee may have a right to demand, a workplace free from unreasonable risks of harm. But "[s]uch tort-law rights and duties . . . are

41

quite distinct from those secured by the Constitution or federal law," *id.* at 1481, and the Supreme Court has repeatedly warned "that section 1983 must not be used to duplicate state tort law on the federal level," *id.* at 1480.

Just as in *Washington*, the Kauchers have alleged what is properly characterized as a tort law claim. They contend defendants breached a duty of care by failing to provide Kaucher a safe work environment. As the Court of Appeals for the D.C. Circuit noted, defendants may have a duty under state law to provide a working environment free from unreasonable risks of harm, but they have no duty to do so under the Constitution. *See id.* at 1481.

### E.

We conclude the Kauchers' claims relate to a failure to remedy conditions at the jail. The Kauchers allege defendants failed to prevent MRSA from spreading through the jail, took insufficient action to protect the jail's corrections officers from contracting an infection, and failed to warn and educate corrections officers in infection prevention. Despite their attempts to characterize defendants' actions as affirmatively creating dangerous conditions, they allege a failure to act to prevent dangerous conditions. Under *Collins*, this claim must fail. Kaucher "voluntarily accepted[] an offer of employment," *Collins*, 503 U.S. at 128, and the Due Process Clause does not "guarantee municipal employees a workplace that is free of unreasonable risks of harm," *id.* at 129.

42

## IV.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment dismissing the Kauchers' claim.